Slip Op. 06-103

UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                                                    :
PS CHEZ SIDNEY, L.L.C.,                              :
                                                    :
                Plaintiff,                           :
                                                    :
        v.                                           :
                                                    :
UNITED STATES INTERNATIONAL                          :
TRADE COMMISSION, and                                :
UNITED STATES CUSTOMS                                :
SERVICE,                                             :      Before:        WALLACH, Judge
                                                    :      Court No.:      02-00635
                Defendants,                          :
                                                    :
        and                                          :
                                                    :
CRAWFISH PROCESSORS                                  :
ALLIANCE, <u>et</u> <u>al.</u>,                      :
                                                    :
                Defendant-Intervenors.               :
_____:

[Plaintiff's Motion for Summary Judgment is Partially Granted and Partially Denied; Defendant's Counter Motion for Summary Judgment is Partially Granted.]

Dated: July 13, 2006

<u>Wolff Ardis, P.C.</u>, (<u>William E. Brown</u>) for Plaintiff, PS Chez Sidney, L.L.C.

<u>Peter D. Keisler</u>, Assistant Attorney General; <u>David M. Cohen</u>, Director; <u>Jeanne E. Davidson</u>, Deputy Director; <u>David S. Silverbrand</u> and <u>Paul D. Kovac</u>, Trial Attorneys, U.S. Department of Justice, Civil Division, Commercial Litigation Branch; <u>Michael Diehl</u>, Attorney-Advisor, Office of the General Counsel, United States International Trade Commission; for Defendant, United States.

<u>Adduci, Mastriani & Schaumberg, LLP</u>, (<u>Will E. Leonard</u>), for Defendant-Intervenors, Crawfish Processors Alliance, Bob Odom, Commissioner, the Louisiana Department of Agriculture and Forestry.

1

Sonnenschein, Nath & Rosenthal, (Michael A. Bamberger), for Amicus INA USA Corporation.

Arnold & Porter, LLP, (Michael T. Shor and Claire E. Reade), for Amicus Giorgio Foods Inc.

Collier, Shannon, Scott, PLLC (David A. Hartquist), for Amicus Committee to Support U.S. Trade Laws.

## OPINION

**Wallach, Judge:**

## I
## Introduction

This case arises out of an effort by Plaintiff, PS Chez Sidney, L.L.C., ("Chez Sidney") a Louisiana seafood producer, to be included in payments to the domestic crawfish industry under the Continued Dumping and Subsidy Offset Act of 2000 ("CDSOA").[1]

The court here considers[2] the constitutionality[3] of the CDSOA, which requires the

---

[1] The Byrd Amendment, Pub. L. No. 106-387, § 1003, 114 Stat. 1549, 1623 (2000), codified at 19 U.S.C. § 1675c.

[2] The parties have raised a number of other issues in their competing motions. Plaintiff initially filed a Motion For Preliminary Injunction which it then incorporated into a Motion For Summary Judgment. Both sought to compel the U.S. International Trade Commission ("ITC") and the U.S. Customs Service ("Customs") to add Plaintiff to the group of affected domestic producers potentially eligible for distribution of collected duties, and to enjoin Customs from distributing the duties. Defendant filed a Counter Motion for Summary Judgment pursuant to USCIT R. 56.1. In its initial Motion and during discussions with the court, Plaintiff's counsel raised the issue of its First Amendment Claim. Complaint ¶ 27. The court requested further briefing on that issue, and eventually, also sought the filing of amicus briefs. This Opinion disposes of all issues raised by the parties in those motions.

[3] Plaintiff's other grounds, briefed in its pending Motion for Summary Judgment, lack sufficient support pursuant to USCIT R. 56. There remain no other grounds for determining its Motion than the First Amendment claims stated in its Complaint. Dep't of Commerce v. U.S. House of Representatives, 525 U.S. 316, 343-44, 119 S. Ct. 765, 142 L. Ed. 2d 797 (1999) ("[I]f a case can be decided on either of two grounds, one involving a constitutional, the other a question of statutory construction or general law, the Court will decide only the latter.") (citing Ashwandes v. TVA, 297 U.S. 288, 347, 56 S. Ct. 466, 80 L. Ed 688 (1936)).

2

government to pay moneys collected as antidumping duties to any affected U.S. domestic

Plaintiff raised two non-constitutional arguments in its initial Motion For Summary Judgment: 1) that the ITC's reliance on the final questionnaire response was arbitrary and capricious "because the final questionnaire response was not signed, was not certified by an authorized official as complete and correct, did not contain the 'name of the establishment(s) covered by this questionnaire,' did not indicate that the 'x' in the 'Take no position' box was ever authorized or submitted by Chez Sidney Seafood," and 2) that "the ITC misinterpreted the Byrd Amendment by determining that "the initial 1996 questionnaire response did not satisfy the support requirement.

Its first argument fails for waiver because the issue was never raised at the administrative level. The exhaustion doctrine requires a party to present its claims to the relevant administrative agency for consideration before raising them to the court. Timken Co. v. United States, 24 CIT 434, 459, 201 F. Supp. 2d 1316 (2002). The court may nonetheless excuse parties from exhausting their administrative remedies in cases where certain exceptions are found. FAG Kugelfischer Georg Schafer AG v. United States, 25 CIT 74, 82, 131 F. Supp. 2d 104 (2001) (internal citations omitted). Chez Sidney, however, has not argued that any of them apply. As it stands, its factual claim must fail because it has consistently represented that it, or its predecessor, Chez Sidney Seafood, Inc., did in fact submit the final questionnaire. In the proceedings related to Chez Sidney's Motion for Preliminary Injunction, Chez Sidney affirmatively indicated that it has submitted the questionnaire and that it had checked the box marked "Take no position." Specifically, Chez Sidney stated: "[T]he USITC records show that PS Chez Sidney's predecessor submitted two questionnaire responses, one with the box checked 'Support' and one with the box checked 'Take No Position.'" Motion for Preliminary Injunction at 6. Chez Sidney further affirmed that "[t]he questionnaire shows that Chez Sidney checked the box marked 'Take no position' instead of the box marked 'Support.'" Motion for Preliminary Injunction at 2, 6. Chez Sidney's Complaint also affirms that it marked the "Take No Position" box and submitted the final questionnaire. Complaint at ¶21 (stating that "[Chez Sidney] . . . had no knowledge or information that checking the "Take no position" box instead of the "Support" box in the May 5, 1997 Questionnaire would result in denial of eligibility for a distribution of antidumping duties.") These admissions authoritatively refute Chez Sidney's present claim that the final questionnaire response was somehow an unauthorized expression of its position.

As to Plaintiff's second argument, the ITC attempted to resolve the factual question of whether Chez Sidney indicated support for the subject petition. In doing so, it looked to the two questionnaires and gave weight to Chez Sidney's latest expressed position during the investigation. As in Armstrong Bros. Tool Co. v. United States, 84 Cust. Ct. 102, 489 F. Supp. 269 (1980), Chez Sidney here "essentially challenge[s] discretionary findings by the [ITC]." Id. at 113. In Armstrong Bros., the Customs Court stated: [I]t is not the function of the court in reviewing an injury determination of the Commission under the Antidumping Act to weigh the evidence or substitute its judgment for that of the Commission." Id.

producer, a status defined, in part, as "a petitioner or interested party in support of the petition with respect to which" an antidumping or countervailing duty order has been entered. 19 U.S.C. §1675c(b)(1)(a) (2000) ("support provision"). At issue is nonpayment to a member of the domestic industry which declined to support the petition.[4]

The court must decide whether the Plaintiff has standing to raise this constitutional challenge to the Government's refusal to pay it a *pro rata* share of antidumping duties collected as a result of the final affirmative injury determination for the dumping of freshwater crawfish tail meat from China. Notice of Final Determination of Sales at Less Than Fair Value: Freshwater Crawfish Tail Meat From the People's Republic of China, 62 Fed. Reg. 41,347 (August 1, 1997) as amended by Notice of Amendment to Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Freshwater Crawfish Tail Meat From the People's Republic of China, 62 Fed. Reg. 48,218 (September 15, 1997) ("Final Determination"). The Government initially argued that Plaintiff lacked standing to challenge the support provision's constitutionality because Chez Sidney declined to support the petition three years before the CDSOA was enacted. Defendant United States Customs Service Supplemental Brief in Support of the Constitutionality of the [CDSOA] ("Customs Supplemental Brief") at 11. At oral argument, the Government abandoned that position, but continued to maintain Plaintiff lacked standing as to all future injury that might occur as a result of additional distributions or

---

[4] Plaintiff also challenges the determination on a factual basis, alleging that it should be permitted to reopen the administrative record to submit evidence questioning the validity of the determination that the questionnaire response here at issue constituted a withdrawal of support. Because it fails to allege any of the bases available to permit such supplementation, that portion of Plaintiff's Motion for Summary Judgment must be denied. Bergeron's Seafood v. U.S. Int'l Trade Comm'n, 306 F. Supp. 2d 1353 (CIT 2004).

sunset reviews.[5]

Given even the limited concession of standing , the court must determine the constitutionality of the support provision.  Plaintiff has argued constitutional violations under both the First Amendment and the Equal Protection Clause of the Fourteenth Amendment.[6] Finally, if the court determines that a constitutional violation exists, it must find whether the offending portion of the statute is severable from its remaining provisions.

The court has jurisdiction pursuant to 28 U.S.C. § 1581(i).  For the reasons set out below, the court has found a violation of the First Amendment, and severability.  In sum, however, the court finds that when, as part of an Act of Congress, the Government distributed benefits that are

_____

[5] Sunset reviews are five-year reviews pursuant to 19 U.S.C. § 1675(c).  They are defined as:

(c) Five-year review.

> (1) In general. Notwithstanding subsection (b) and except in the case of a transition order defined in paragraph (6), 5 years after the date of publication of–

>> (A) a countervailing duty order (other than a countervailing duty order to which subparagraph (B) applies or which was issued without an affirmative determination of injury by the Commission under section 303), an antidumping duty order, or a notice of suspension of an investigation, described in subsection (a)(1),

>> *    *    *

>> the administering authority and the Commission shall conduct a review to determine, in accordance with section 752 [19 U.S.C. § 1675a], whether revocation of the countervailing or antidumping duty order or termination of the investigation suspended under section 704 or 734 [19 U.S.C. § 1671c or 1673c] would be likely to lead to continuation or recurrence of dumping or a countervailable subsidy (as the case may be) and of material injury.

[6] Chez Sidney has not formally abandoned its Equal Protection argument but agreed at oral argument that it was entirely subsumed within, and based on, its First Amendment claim.

conditioned on what effectively amounts to political support by an otherwise qualified recipient for governmental action, that support requirement is subject to strict scrutiny under the Constitution. Where, as here, the provision fails that scrutiny, Supreme Court authority renders the requirement facially invalid.

## II
## The Uncontested Facts of this Case

In 1996, members of the domestic crawfish tail meat industry, represented by the Crawfish Processors Alliance ("CPA") filed an antidumping petition before the U.S. International Trade Commission ("ITC"), alleging that imports of freshwater crawfish tail meat from the People's Republic of China ("PRC") were being sold in the United States at less than fair value and were materially injuring, or threatening material injury to the domestic crawfish industry. Freshwater Crawfish Tail Meat From the People's Republic of China: Initiation of Antidumping Investigation, 61 Fed. Reg. 54,154, 54,155 (October 17, 1996).[7]

The ITC initiated an antidumping investigation and issued questionnaires to domestic crawfish producers at both the preliminary and final phases of its investigation.[8] The

---

[7] Chez Sidney Seafood, Inc. (PS Chez Sidney's predecessor) was not a petitioner.

[8] Article 5.4 of the WTO Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade ("GATT") Antidumping Agreement ("AD Agreement") provides that:

> An investigation shall not be initiated . . . unless the authorities have determined, on the basis of an examination of the degree of support for, or opposition to, the application expressed by domestic producers of the like product, that the application has been made by or on behalf of the domestic industry. The application shall be considered to have been made "by or on behalf of the domestic industry" if it is supported by those domestic producers whose collective output constitutes more than 50 per cent of the total production of the like product produced by that portion of the domestic industry expressing either support for or

6

questionnaires required domestic producers to check a box indicating whether they "Support," "Oppose," or "Take No Position" regarding the antidumping petition. Administrative Record ("AR"), Document 65. Chez Sidney checked the box showing its "Support" for the CPA's petition in its October 7, 1996 response to the initial questionnaire. Customs Supplemental Brief at 9-10. On March 26, 1997, the Department of Commerce ("Commerce" or "the Department") published its preliminary determination finding affirmative material injury in its investigation in Notice of Preliminary Determination of Sales at Less Than Fair Value: Freshwater Crawfish Tail Meat From the People's Republic of China, 62 Fed. Reg. 14,392 (March 26, 1997) ("Preliminary Determination").

During the final phase of its injury investigation, the ITC issued a second ITC questionnaire. In its May 5, 1997 response, Chez Sidney answered "Take No Position" to the ITC's support question.[9] Commerce issued its amended Final Determination on September 15, 1997, affirming its findings in the Preliminary Determination. Final Determination.

In the interim, the CDSOA was enacted on October 28, 2000. See Discussion of CDSOA under Section V *infra*. The parties agree that the primary purpose of providing distributions to affected domestic producers is to remedy effects of injurious dumping and restore free trade.

The ITC took the position that pursuant to the CDSOA, only those producers who check

opposition to the application. However, no investigation shall be initiated when domestic producers expressly supporting the application account for less than 25 per cent of total production of the like product produced by the domestic industry. (emphasis added).

[9] In its Reply, Plaintiff argued that it actually supported the petition because it had been harmed by the dumped imports of crawfish tail meat. Plaintiff's Reply Brief on First Amendment Issue ("Plaintiff's Reply") at 8.

"[s]upport" are considered "affected domestic producers" and are subsequently eligible to file for certification to receive offset distributions under the CDSOA. 19 U.S.C. § 1675c(a)(6) repealed by Pub. L. 109-171, Title VII, § 7601(a), 120 Stat. 154 (February 8, 2006).[10] It provided Customs with a list of affected domestic producers who could then seek certification for offset distributions for fiscal year 2002. Distribution of Continued Dumping and Subsidy Offset to Affected Domestic Producers, 67 Fed. Reg. 44,722 (July 3, 2002). The only entity listed in the "Petitioners/Supporters" column for the crawfish antidumping duty order was the CPA. Id. at 44,735. Similarly during the previous year on August 3, 2001, Customs published a list of domestic producers which indicated support for the investigation on the ITC questionnaires. Distribution of Continued Dumping and Subsidy Offset to Affected Domestic Producers, 66 Fed. Reg. 40,782 (August 3, 2001). Chez Sidney was not included in this list either. Id. at 40,796.

On August 19, 2002, Chez Sidney sent a letter to the ITC requesting an offset distribution and status as an affected domestic producer, but was denied because "[t]he final questionnaire response filed by [Chez Sidney] in the original investigation does not indicate support for the petition." Defendant's Opposition to Plaintiff's Motion for Summary Judgment ("Defendant's Opposition") at 7 (citing Custom' Appendix at 3,4).

On September 6, 2002, Chez Sidney requested reconsideration for certification as an

---

[10] The United States has taken the position before a World Trade Organization ("WTO") Panel in a dispute settlement proceeding regarding the CDSOA that the CDSOA does not require producers to show injury from dumping or subsidization to receive distributions, that the distribution amount is unconnected to actual injury, and that CDSOA payments can outlast an existing anti-dumping order. Report of Panel WT/DS217/R, WT/DS234/R, September 16, 2002 at ¶ 4.515. While WTO proceedings are neither binding upon nor dispositive for this court, see Corus Staal BV v. Dep't of Commerce, 395 F. 3d 1343, 1348 (Fed. Cir. 2005) (citing Timken Co. v. United States, 354 F.3d 1334, 1344 (Fed. Cir. 2004)), positions taken by the United States regarding application of the CDSOA are relevant evidence of facts.

"affected domestic producer," arguing that its "[s]upport" response in the initial questionnaire satisfied the CDSOA's requirement that a crawfish producer "be an interested party in support of the petition." Defendant's Opposition at 7 (citing Custom's Appendix at 5). The request was denied on September 12, 2002, by the ITC based on Plaintiff's "conflicting statements" regarding support for the petition and because "[t]ake no position" was its "last expressed position during the investigation." Id. (citing Id. at 6). The ITC "determined that Chez Sidney did not show the requisite support for the petition and declined to add Chez Sidney's name to the list of potential 'affected domestic producers'" and Customs then denied Chez Sidney's certification for offset distributions." Supplemental Brief at 10 (citing Defendant's Appendix at 6, 7).[11]

### III
### The Procedural Posture of Case

On October 2, 2002, Chez Sidney commenced this action before this court and subsequently filed a Motion For a Preliminary Injunction to enjoin Customs from distributing what Chez Sidney claimed was its share of the distribution. On October 31, 2002, Chez Sidney submitted a letter to the clerk of the court requesting that various non-record documents be added to the record. On November 6, 2002, the ITC filed a Motion to Strike the non-record documents, explaining that the statute requires that support for the petition be determined based on indications of support "by letter or through questionnaire response" that are in the record of the

---

[11] There are a number of contested facts but none seem relevant to disposition of this issue. Defendant claims in its Supplemental Brief at 5 that "the indication of support or non-support for the petition is requested only once during the initial ITC investigation," and again during a five-year sunset review. Later, however, it concedes that Chez Sidney checked the "support" "box in its October 7, 1996 "response to the preliminary phase questionnaire" and checked the "Take no position" box in its May 5, 1997, response "to the ITC's final questionnaire . . ." Id. at 9-10.

9

ITC. The ITC also noted that the non-record documents proposed by Chez Sidney were created after the filing of the present action, and thus were not before the ITC during the administrative proceeding.

On November 7, 2002, this court heard argument on Chez Sidney's Motion for Preliminary Injunction and the ITC's Motion to Strike. The court orally granted a motion to intervene filed by the CPA and the Louisiana Department of Agriculture and Forestry and Bob Odom, Commissioner. The court denied the Motion to Strike, but ruled from the bench that the case would be based on the administrative record, and that it would disregard the non-record documents. The court denied Chez Sidney's Motion finding it failed to demonstrate irreparable harm. PS Chez Sidney v. USITC & Customs, Court No. 02-00635 (November 8, 2002) The court also ordered Chez Sidney to supplement its Motion For Summary Judgment and ordered Defendant to respond within 45 days thereafter.

On November 13, 2002, Chez Sidney moved for an injunction pending resolution of an interlocutory appeal to the Federal Circuit of this court's denial of a preliminary injunction. The Federal Circuit denied the motion. PS Chez Sidney v. USITC & Customs, Court No. 03-1071 (Fed. Cir. Dec. 5, 2002) (Order denying Motion to Reconsider Denial of Motion for Injunction). Chez Sidney subsequently filed for re-consideration at the Federal Circuit.[12] On February 27, 2003, the Federal Circuit issued an order granting Chez Sidney's motion to voluntarily dismiss its appeal before the Federal Circuit as moot. PS Chez Sidney v. USITC & Customs, Court No. 03-1071 (Fed. Cir. Feb. 27, 2003) (Order granting Motion of PS Chez Sidney, L.L.C. to

---

[12] Chez Sidney simultaneously filed a motion for an injunction pending appeal with this court. This court denied the motion. See PS Chez Sidney v. USITC & Customs, Court No. 02-00635 (December 13, 2002) (Order denying Plaintiff's Motion for Injunction Pending Appeal).

voluntarily dismiss its appeal as moot).

On January 24, 2003, and January 27, 2003, respectively, the ITC and Customs filed

Motions for Judgment Upon the Agency Record.  Because the court determined that Chez

Sidney's Motion For Summary Judgment and the ITC's and Customs' Motions were integrally

intertwined, with the same administrative decisions at the heart of all the briefs before the court,

oral argument was set for both motions at the same time.

## IV
## The Relevance of Questionnaires To Antidumping Law

19 U.S.C. §1671a(b)(1) and 19 U.S.C. §1673a(b)(1) mandate that countervailing duty and

antidumping proceedings be initiated whenever an interested party "files a petition with the

administering authority, on behalf of an industry . . .." Id.  To demonstrate that the petition is "on

behalf" of the domestic industry, both require establishment of minimum levels of support. 19

U.S.C. §1671a(c)(4)(A) and U.S.C. §1673a(c)(4)(A) (domestic producers or workers who

support the petition must account for at least 25 percent of total production of the total like

product and more than 50 percent of the production of the portion of the industry that expressed

support or opposition to the petition).[13]

---

[13] Whether a petition is brought on behalf of U.S. industry is decided by Commerce, but the ITC data is used by Commerce to decide whether it needs to further poll to determine support. See Import Administration, Antidumping Manual, Chapter 1 at 9-10 (1997) http://ia.ita.doc.gov/admanual/admanual (last visited July 12, 2006); see also U.S. International Trade Commission, Antidumping and Countervailing Duty Handbook at I-6 (January 2005) ("Handbook"), http://www.usitc.gov/publications/webpubs.htm (last visited July 12, 2006).

The first paragraph of the Uruguay Round Agreements Act Statement of Administrative Action states "[this] bill approves and makes statutory changes required or appropriate to implement the Uruguay Round agreements." Uruguay Round Agreements. Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316, at 807, 810-12 (1994) as reprinted in 1994 U.S.C.C.A.N. 4040, 4153-55 ("SAA") at 656 that "[t]he

Commerce may issue an antidumping order imposing duties on the imported merchandise. Antidumping orders may be issued when (1) an investigation by Commerce reveals that "a class or kind of merchandise is being, or likely to be" dumped in the United States; and (2) an additional investigation by the ITC determines that "an industry in the United States" is "materially injured" or "threatened with material injury," or "the establishment of an industry in the United States is materially retarded" by imports of that merchandise or sales of that merchandise for import. 19 U.S.C. § 1673. Determination of injury or its threat in a fair and objective manner is a substantial portion of the ITC's mission.[14]

The ITC conducts a preliminary investigation to determine whether "an industry in the United States is materially injured, or is threatened with material injury, or the establishment of an industry in the United States is materially retarded . . .." 19 U.S.C. § 1673b(a)(1)(A). Following an affirmative finding of harm, Commerce makes a preliminary determination of whether there is a reasonable basis to believe that injury has occurred. Cf. Jeannette Sheet Glass

administration intends that Commerce will amend its regulations as necessary to implement the requirements of Article 5.2 of the Antidumping Agreement. . .," and the Act that it amends 19 U.S.C. § 1673(c) in "a manner consistent with the Agreements." Id. at 861-62.

After the implementation of the SAA, 19 U.S.C. § 1673a(c) was amended to include subsection (4), which provides guidelines for a determination of industry support. Now, for an antidumping investigation to be initiated, 1) the producers of workers who support the petition account for at least 25% of the total production of the domestic like product and, 2) those producers and workers that make up at least that 25% must account for more than half of the production of the domestic like product. 19 U.S.C. § 1673a(c)(4)(A)(i) and (ii).

[14] Part of the mission of the ITC is to "administer U.S. trade remedy laws within its mandate in a fair and objective manner." See Mission Statement to ITC Strategic Plan (2003-2008); see also Transcript of Oral Argument, ("TR") March 12, 2004, at 11. That mandate includes antidumping investigations which must be administered in "a fair and impartial manner." TR at 12.

Corp. v. United States, 11 CIT 10, 654 F. Supp. 179 (1987).[15]

To make an injury determination, the ITC first defines one or more domestic like products that correspond to the dumped or subsidized imports identified by Commerce and, in turn, identifies the industry or industries producing these like products. See 19 U.S.C. § 1671d(b) (countervailing duties); 19 U.S.C. § 1673d(b) (dumped merchandise); see also Timken Co. v. United States, 20 CIT 76, 79, 913 F. Supp. 580 (1996) ("[I]n determining whether an industry in the United States is materially injured or threatened with material injury by reason of the subject imports, the Commission must first define the 'like product' in order to determine the relevant 'industry.'"). A "domestic like product" is defined as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation." 19 U.S.C. § 1677(10). The relevant "industry," in turn, is defined as the "producers as a whole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product." 19 U.S.C. § 1677(4)(A); see generally, Caribbean Ispat Ltd. v. United States, 2006 U.S. App. LEXIS 11065 (Fed. Cir. 2006).

Having identified those classes of products, the ITC then determines whether imports of products falling within the classes identified have caused material injury to the domestic industry which produces those products. 19 U.S.C. § 1673(2); 19 U.S.C. § 1673b(a)(1); 19 U.S.C. § 1677(7).

---

[15] In its Antidumping and Countervailing Duty Handbook, Commerce notes that "[i]f the petition does not establish support of domestic producers or workers accounting for more than 50 per cent of the total production of the domestic like product, Commerce must poll the industry or rely on other information to determine if the required level of support for the petition exists." Handbook at I-6.

As one step in determining whether domestic industry is injured, the Government conducts what is in essence a survey among members of the domestic industry. The parties are at odds because the Government views the results of that survey as a fact and not a statement of opinion. Plaintiff, however, argues that the support, or non-support, or take no position questions on the survey invite a statement of opinion. The problem faced by the Government is that whenever members of the public are asked for their opinion they have a constitutional right to hold that view for a myriad of reasons, only one of which is congruent with the Government's position. The Government and *Amici's* forceful arguments amount to a belief that economic reality indicates industry respondents will act only as rational economic beings. The Government concedes, however, that a respondent might reasonably support or oppose on other bases. That reasonable possibility is enough to render the support provision unconstitutional.

If the Government had only to demonstrate a rational basis for the support provision it could do so. It is rational to believe that there may be some correlation, indeed, quite possibly a high one, between expression of support for a dumping petition and injury to the responder. A higher level of review applies, however, to the expression of a particular point of view, because the distribution of funds is based upon the answer to what is inherently a public policy question.

Thus, the support question in the ITC Questionnaire is itself absolutely necessary to serve a compelling government interest[16] as defined by the WTO Agreement. Its use, however, for determining who receives distribution of government funds is not. R.A.V. v. City of St. Paul, 505 U.S. 377, 112 S. Ct. 2538, 120 L. Ed. 2d 305 (1992). There are a number of other ways in which

---

[16] The Government certainly has a compelling interest in determining whether an antidumping investigation complies with the requirements of the WTO agreement.

14

the Government might, without more effort than that to which it is already required to go, determine which members of the domestic industry claim they are harmed by foreign dumping or subsidies.

## V
## The Continued Dumping and Subsidy Offset Act of 2000

The CDSOA was adopted by a House-Senate Conference Committee as an Amendment to a Department of Agriculture appropriations bill.[17]

The parties and *amici*[18] all seem to agree that the CDSOA's legislative history expresses Congressional intent to assist domestic U.S. industries injured by foreign dumping and subsidization.[19]  Where they differ is in how the remedy is applied, and is, in part, expressed in

---

[17] The CDSOA was enacted as Title X of P.L. 106-387, § 1002, 114 Stat. 1549 (October 28, 2000) codified at 19 U.S.C. § 1675c (2000), and provided, *inter alia*, that Congress found that "actionable subsidies which cause injury to domestic industries must be effectively neutralized . . ." that "small businesses. . . may be unable to pay down accumulated debt, to obtain working capital, or to otherwise remain viable" and that "United States trade laws should be strengthened to see that the remedial purpose of those laws is achieved." Id.

[18] The *amici* to this proceeding are INA USA Corporation ("INA"), Giorgio Foods Inc. ("Giorgio"), and the Committee to Support U.S. Trade Laws ("CSUSTL").

[19] 19 U.S.C. § 1675c (2000) states:

(a) In general

Duties assessed pursuant to a countervailing duty order, an antidumping duty order, or a finding under the Antidumping Act of 1921 shall be distributed on an annual basis under this section to the affected domestic producers for qualifying expenditures.  Such distribution shall be known as the "continued dumping and subsidy offset."

(b) Definitions

As used in this section:

CSUSTL's argument:

The CDSOA's legislative history demonstrates that the class of persons Congress intended as the law's beneficiaries were those domestic producers that perceived

---

(1) Affected domestic producer

The term "affected domestic producer" means any manufacturer, producer, farmer, rancher, or worker representative (including associations of such persons) that --

(A) was a petitioner or interested party in support of the petition with respect to which an antidumping duty order, a finding under the Antidumping Act of 1921, or a countervailing duty order has been entered, and

(B) remains in operation.

Companies, businesses, or persons that have ceased the production of the product covered by the order or finding or who have been acquired by a company or business that is related to a company that opposed the investigation shall not be an affected domestic producer.

*   *   *

(d) Parties eligible for distribution of antidumping and countervailing duties assessed

(1) List of affected domestic producers

The Commission shall forward to the Commissioner within 60 days after the effective date of this section in the case of orders or findings in effect on January 1, 1999, or thereafter, or in any other case, within 60 days after the date an antidumping or countervailing duty order or finding is issued, a list of petitioners and persons with respect to each order and finding and a list of persons that indicate support of the petition by letter or through questionnaire response. In those cases in which a determination of injury was not required or the Commission's records do not permit an identification of those in support of a petition, the Commission shall consult with the administering authority to determine the identity of the petitioner and those domestic parties who have entered appearances during administrative reviews conducted by the administering authority under section 1675 of this title.

16

themselves as harmed <u>and were concerned enough to want a remedy against dumped and subsidized imports, but had seen that remedy frustrated by continued dumped and subsidized imports.</u>

Brief of *Amicus Curiae*, The Committee to Support U.S. Trade Laws ("CSUSTL Amicus Brief") at 9 (emphasis added).[20]

INA argues that, in fact, the Government has taken the position in appearances before the World Trade Organization that the CDSOA does not require producers to show they were injured to receive distributions. *Amicus Brief* of INA USA Corp. as to First Amendment Issues ("INA Amicus Brief") at 4.[21]

---

[20] CSUSTL, for example, quotes Sen. DeWine of Ohio, "[t]hese foreign practices have reduced the ability of <u>our injured domestic industries </u>to [compete] . . ." CSUSTL Amicus Brief at 11 (citing 145 CONG. REC. S497 (daily ed. January 19, 1999) (statement of Sen. DeWine) (emphasis added); Sen. Byrd of West Virginia, "[c]ontinued foreign dumping and subsidy practices have reduced the ability of <u>our injured domestic industries </u>to [compete] . . ." <u>Id.</u> (citing 146 CONG. REC. S10697 (daily ed. October 18, 2000) (statement of Sen. Byrd) (emphasis added); and Rep. Nancy Johnson of Connecticut, "[t]he amendment . . . would reduce the adverse effect of continued dumping or subsidization by <u>distributing the monies finally assessed to the injured industry</u>. <u>Id.</u> (citing ___ CONG. REC. H9708 (daily ed. October 11, 2000) (statement of Rep. Nancy Johnson) (emphasis added).

<u>Nothing</u> cited by CSUSTL in the legislative history actually stands for the proposition emphasized above. Rather, it seems to indicate that Congress expressed its concern with assisting injured domestic industry. It does <u>not</u> express any legislative rationale for distinguishing among harmed members of industries on the basis of whether they wanted a remedy but had seen it frustrated.

[21] In late 2000, one of the final acts of the outgoing 106th U.S. Congress was to pass the Agriculture Spending Bill, P. L. 106-387. Included in that bill, as amendment Title X, Senator Robert Byrd inserted the Continued Dumping and Subsidy Offset Act of 2000 (the "Byrd Amendment"). <u>See</u> 146 CONG. REC. S10697. While the CDSOA, originally authored by Senator DeWine of Ohio, was around since early in the 106th Congress, it had failed to gather support. <u>See</u> 145 CONG. REC. S497; <u>see</u> <u>also</u> 144 CONG. REC. S7883-84 (July 9, 1998) (statement of Sen. DeWine) (introducing the bill). Senator Byrd added the amendment as an unrelated "rider," Title X, to the critical agricultural appropriations bill, instead of handling it through the Ways and Means Committee in the House and the Finance Committee in the Senate, through which subsidies and dumping matters usually travel. <u>See</u> 146 CONG. REC. S10697.

# VI
## The Issues Currently Before The Court

As will be discussed in depth below, Defendant, at oral argument, at least partially conceded[22] Plaintiff's standing to raise the arguments here discussed. Plaintiff conceded its argument under the Equal Protection Clause. What remain for discussion here, accordingly, are the following questions:

First, has Plaintiff asserted a viable claim that the CDSOA violates the First Amendment? As part of the answer to that question the court must consider any possible alternative which does not implicate constitutional invalidity of a Congressional act.

Second, is any violative section severable from the entire scheme, or must it fail *in toto*?

Third, in light of the questions above what remedy is available to Plaintiff for any violation found?

The second and third questions need only be reached on ultimate determination of the

---

Thus, the bill was approved without any significant Congressional debate or analysis, resulting in minimal legislative history, save a statement by Senator Nickles questioning why the bill did not go through the normal procedures. See 146 CONG. REC. S10732-01 (daily ed. Oct. 18, 2000).

Interestingly, INA, which is a bearing producer, complains in its Amicus Brief, that the CDSOA payments have distorted competition within the domestic industry by providing massive government subsidies to one domestic ball bearing and cylindrical roller bearing producer, which it alleges received 99 per cent of CDSOA payments made to the industry in 2001 and 2002. INA Amicus Brief at 5-6. That company, Timken, is headquartered in Canton, Ohio. Id. According to INA, it received the payments through acquisition of the original petitioner the Torrington Company and of MPB. Id. at 6, n.5. The Torrington Company is headquartered in Torrington, Connecticut. Id.

[22] Defendants still contests Plaintiff's standing as to future standing. The questions has been largely mooted by the repeal of the CDSOA. See P.L. 109-171, Title VII, Subtitle F, § 7601(a), 120 Stat. 154 (February 8, 2006).

constitutionality of the CDSOA.[23]

The Parties' arguments on issues related to constitutionality are set forth below.

## VII
## The Parties' Arguments Regarding Constitutionality

The question of validity of the CDSOA under a First Amendment challenge was

extensively briefed both by the parties, and, at the invitation of the court by *amici curiae*.[24]  *Amici*

INA[25] and Giorgio[26] (collectively referred to as "the Challenging *Amici*"), challenged First

---

[23] As is indicated in the Conclusion of this Opinion, the court intends to certify the issues raised for appeal by the parties. Upon resolution by the Court of Appeals, it will decide, if necessary, the issues of severability and remedy.

[24] The *Amicus Curiae* briefs were submitted in response to a question posed by the court to potential amici:

> Whether sections 1675c(b)(1)(A) and 1675c(d)(1) of the Continued Dumping and Subsidy Offset Act of 2000, 19 U.S.C. § 1675c, violate a party's First Amendment right to free speech where these sections condition eligibility for offset distribution benefits based on an expression of that party's support for an antidumping petition.

Order dated June 18, 2003, instructing INA, Giorgio, and CSUSTL to file Amicus Briefs.

The *Amici* have raised several factual assertions *dehors* the record.  The court has not considered those assertions as anything other than illustrative of arguments.

[25] INA, according to its Request To File Amicus Brief, dated May 29, 2003, is one of approximately 36 firms in the United States which produce roller bearings and their parts, and of at least 15 firms that produce cylindrical roller bearings. Id. at 2. Of those companies only three are eligible to receive ball bearing disbursements, and two to receive cylindrical roller bearing disbursements under the CDSOA. Id.  All other members of the domestic industry did not express support for the original antidumping and countervailing duty petition in their industry, and are ineligible to receive disbursements. Id.  INA asserts the distributions have given a competitive advantage to recipients over their domestic competitors who declined to support the petition. Id. at 3.

[26] Giorgio's Motion for Leave to File Brief as Amicus Curiae, dated May 29, 2003, asserts that it is the largest U.S. domestic producer of preserved mushrooms. Id. at 2.  Giorgio

Amendment validity but took differing views on severability. Their views were representative of domestic producers which might benefit from a finding that the support requirement was invalid. *Amicus* the CSUSTL represents domestic entities with an interest in maintaining the constitutional validity of the CDSOA.

**A**
**Arguments Challenging Constitutionality of the CDSOA**

Plaintiff and the Challenging *Amici* raised several points attacking the constitutional validity of the CDSOA. They include arguments that the support requirement amounts to compelled speech burdened by unconstitutional conditions, that it involves imposition of a viewpoint-based eligibility requirement for a government subsidy, and that it is an over-broad burden on speech in a limited public forum.

**1**
**Compelled Speech Burdened by Unconstitutional Conditions**

Plaintiff and *Amicus* INA argues from a line of Supreme Court cases that the CDSOA constitutes governmentally compelled speech burdened by unconstitutional conditions.

INA begins with the Justice Sutherland's proposition in West Virginia State Board of Ed. v. Barnette, 319 U.S. 624, 642, 63 S. Ct. 1178, 87 L. Ed. 1628 (1943) that "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to

was deemed ineligible to receive CDSOA distributions from dumped preserved mushroom imports, it says, because it "did not, check off a box indicating it supported the petitions, even though Giorgio supported the petitions in other ways at the time, and subsequently explicitly advised the ITC of its support for the petitions." Id. at 2-3. Thus, asserts Giorgio, it is being denied a government benefit based solely on the viewpoint of its speech before a government agency. Id.

20

confess by word or act their faith therein." Id. INA cites a number of cases applying that principle to prohibition of government enforced messages.[27] INA identifies as the guiding principle in compelled speech cases the proposition of Wooley v. Maynard, 430 U.S. at 714-15. (1977), that the government may not hammer an individual into "an instrument for fostering public adherence to an ideological point of view he finds unacceptable," and that includes "the right to refrain from speaking at all." Id.

INA then argues that compelled speech principles apply when the government offers a gratuitous benefit conditioned on the surrender of free speech. Again, INA begins its analysis with Justice Sutherland. In Frost & Frost Trucking Co. v. Railroad Comm'n of Calif., 271 U.S. 583, 593, 46 S. Ct. 605, 70 L. Ed. 1101 (1926), INA says, he stated the parameters of the unconstitutional conditions doctrine: "as a general rule, the state, having power to deny a privilege altogether, may grant it upon such conditions as it sees fit to impose. But the power of the state in that respect is not unlimited; and one of the limitations is that it may not impose conditions which require the relinquishment of constitutional rights." Id. at 593.[28] INA says the

_____

[27] See, e.g., Elrod v. Burns, 427 U.S. 347, 355, 965 S. Ct. 2673, 49 L. Ed. 2d 547 (1976) (First Amendment prohibits government discharge of public employee who did not support a political party); Wooley v. Maynard, 430 U.S. 705, 713, 97 S. Ct. 1428, 51 L. Ed. 2d 752 (1977) (unconstitutional to force display of New Hampshire state motto on license plates); and Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, 515 U.S. 557, 576-77, 115 S. Ct. 2338, 132 L. Ed. 2d 487 (1995) (First Amendment prohibits state forced inclusion in parade of marchers with message with which organizers disagreed).

[28] INA identifies three decisions following Frost & Frost as "firmly establish[ing] the unconstitutional conditions doctrine." Spieser v. Randall, 357 U.S. 513, 78 S. Ct. 1332, 2 L. Ed. 2d 1460 (1958) (tax exemption limited to veterans signing loyalty oath unconstitutional); Sherbert v. Verner, 374 U.S. 398, 83 S. Ct. 1790, 10 L. Ed. 2d 965 (1963) (denial of unemployment benefits for refusal to work Sundays unconstitutional); and Shapiro v. Thompson, 394 U.S. 618, 89 S. Ct. 1322, 22 L. Ed. 2d 600 (1969) (welfare benefits limited by length of residence requirement penalize right to travel).

21

Court's view on conditioning benefits on particular speech crystalized in <u>Perry v. Sindermann</u>, 408 U.S. 593, 597, 92 S. Ct. 2694, 33 L. Ed. 2d 570 (1972) ("even though the government may deny [a person a valuable government benefit] for any number of reasons . . . [it] may not deny a benefit to a person on a basis that infringes his constitutionally protected interests— especially, his interest in freedom of speech." <u>Id</u> [29]

INA draws three "overriding principles" from the unconstitutional conditions cases. INA *Amicus* Brief at 13-14.  It says 1) government cannot accomplish indirectly with benefits what it cannot command directly, 2) regulations permitting government discrimination based on content or viewpoint are unconstitutional, and 3) that government could deny the benefit altogether is irrelevant when benefits are conditioned upon relinquishment of First Amendment rights. <u>Id.</u>

Thus, concludes INA, because the CDSOA "clearly burdens political speech,"[30] and "is not viewpoint neutral"[31] it must be analyzed under a strict scrutiny analysis (restriction must be

---

[29] INA cites three more recent cases saying they support the unconstitutional conditions analysis of the CDSOA. <u>Arkansas Writers' Project v. Ragland</u>, 481 U.S. 221, 107 S. Ct. 1722, 95 L. Ed. 2d 209 (1987) (sales tax exemption for certain magazines unconstitutionally conditioned tax status on content discriminating among messages); <u>Rutan v. Republican Party of Ill.</u>, 497 U.S. 62, 110 S. Ct. 2729, 111 L. Ed. 2d 52 (1990) (conditions of public employment on political affiliations violated First Amendment); and <u>Legal Services Corp. v. Velazquez</u>, 531 U.S. 533, 121 S. Ct. 1043, 149 L. Ed. 2d 63 (2001) (government could not condition subsidization of legal aid attorneys on limitation from making of particular arguments).

[30] INA argues, *inter alia*, that "taking a position on the appropriateness of imposing antidumping or countervailing duties on imports potentially involves . . . political issues of the highest order," including protectionism vs. free trade, belief in efficiency of competition, fear of retaliatory trade measures, reduction of marketplace choice, and access to the imports at issue. INA Amicus Brief at 15.

[31] Citing chiefly <u>Rosenberger v. Rector & Visitors of Univ. of Va.</u>, 515 U.S. 819, 828, 115 S. Ct. 2510, 132 L. Ed. 2d 700 (1995) (First Amendment prohibits regulation of speech based on substantive content and government may not favor one speaker over another in private speech). <u>See</u> <u>also</u> discussion *infra* Section VII A 2.

22

narrowly tailored to serve a compelling governmental interest in the least restrictive manner possible). INA *Amicus* Brief at 15-16 (citing Republican Party of Minnesota v. White, 536 U.S. 765, 774-75, 122 S. Ct. 2528, 153 L. Ed. 2d 694 (2002)).[32]

**2**
**Imposition of a Viewpoint-Based Eligibility Requirement For A Government Subsidy**

Plaintiff and *Amicus* Giorgio argue that CDSOA distributions constitute a government subsidy, and conditioning eligibility for that subsidy on adherence to a particular viewpoint violates the First Amendment.

Giorgio cites Perry v. Sindermann, *supra* and Rosenberger, *supra*, for the proposition that "unconstitutional targeting of particular viewpoints is known as 'viewpoint discrimination' and is presumptively unconstitutional." *Amicus Curiae* Brief of Giorgio Foods Inc. ("Giorgio *Amicus* Brief") at 10. Giorgio argues that "viewpoint discrimination is so insidious that it is presumptively invalid," even without application of strict scrutiny. Giorgio Amicus Brief at 11 (citing Rosenberger, 515 U.S. at 828-29; Velazquez, 531 U.S. at 533; Baird v. State Bar of Ariz., 401 U.S. 1, 7, 91 S. Ct. 702, 27 L. Ed. 2d 639 (1971) (" . . . a State may not inquire about a man's views or associations solely for the purpose of withholding a right or benefit because of what he believes.").[33]

---

[32] Plaintiff argues that the Court in Rosenberger and Velazquez did not engage in strict scrutiny analysis, and appears to have established a principle that "viewpoint discrimination in awarding subsidies violates the First Amendment without consideration [of strict scrutiny standards]." Brief on First Amendment Issue by Plaintiff PS Chez Sidney, LLC ("Plaintiff's First Amendment Brief") at 7. While the proposition might be considered arguable, this court sees no need to break new ground with that analysis and declines to apply it.

[33] Giorgio claims the CDSOA ties eligibility for distributions "to speech and to one particular viewpoint." Giorgio Amicus Brief at 13. Thus, it says, domestic producers who believe in free trade, those who believe injury is caused by non-import factors, those with

Because an exception allows the government to impose its viewpoint when it is the speaker or private parties are promoting the government's message, Velazquez, 531 U.S. at 541, Giorgio also argues the exception is inapplicable because the CDSOA targets private speech only and does not provide for any sort of governmental message. Giorgio *Amicus* Brief at 15-16 (citing Rust v. Sullivan, 500 U.S. 173, 196 S. Ct. 1759, 114 L. Ed. 2d 233 (1991)).

### 3
### Overbroad Burden on Speech in a Limited Public Forum

*Amicus* Giorgio also argues that the ITC investigative process necessarily creates a limited public forum[34] for political speech. Giorgio *Amicus* Brief at 17.  This is necessarily so, Giorgio says, because "[t]he ability of individual domestic producers to speak freely, without fear of a governmental penalty . . . is crucial to the ability of [ITC and Commerce] to carry out their statutory functions." Id.  Although the government needs not create or maintain such a forum, once it does so, Giorgio argues, the government may not impose its own viewpoint or any content based restriction[35] on speech unless it is narrowly drawn to effectuate a compelling state interest. Id. (citing Rosenberger, 515 U.S. at 829).

Giorgio claims that by creating a direct financial incentive for petition support, the

_____

overseas interests, and those who wish to keep their views private would all be denied subsidies "solely based on the viewpoint (or absence of viewpoint) of their speech." Id. at 14.

[34] A "limited public forum," Giorgio says, "consists of public property which the state has opened for use by the public as a place for expressive activity." Giorgio Amicus Brief at 17 (quoting Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45, 103 S. Ct. 948, 74 L. Ed. 2d 794 (1983)).

[35] Giorgio concedes that content discrimination may be permissible if it preserves the purpose of the limited forum, as opposed to viewpoint discrimination which is presumed impermissible. Giorgio Amicus Brief at 18 (citing Rosenberger, 515 U.S. at 830).

CDSOA distorts viewpoints received by the ITC on an important issue of public policy, and uses the forum created "in an unconventional way to suppress speech inherent in the nature of the medium . . .." Giorgio Amicus Brief at 20 (citing Velazquez, 531 U.S. at 543). The support requirement, Giorgio says, is not narrowly tailored to further a compelling government interest, because its expressed objective is to compensate domestic industry and workers for economic injury, an objective which could be attained without reference to support or opposition to a political question.[36] Giorgio *Amicus* Brief at 21-22.

**B**
**Arguments Supporting Constitutionality of the CDSOA[37]**

Defendant United States and *Amicus* CSUSTL attempt to both refute the arguments of Plaintiff and its supporting *Amici*, and raise additional arguments in support of their proposition that the CDSOA meets constitutional muster. Those arguments are discussed in summary below.

**1**
**The Spending Clause Endows Congress With Broad Authority In Federal Assistance Programs**

The Government and *Amicus* CSUSTL argue that under the Constitution's Spending

---

[36] Giorgio also argues that the support requirement is unconstitutional regardless of whether the response was made before or after the CDSOA became law. Giorgio Amicus Brief at 23. It cites, *inter alia*, Baird, 401 U.S. at 8, for the proposition that the First Amendment generally prohibits inquiry into past views and beliefs to determine current government benefits.

[37] The Government initially raised an argument that Plaintiff lacked standing to assert a First Amendment challenge because the CDSOA was signed into law in 2000, and allegedly had no impact on Chez Sidney's expression in its May 5, 1997 questionnaire response. Supplemental Brief at 11, *et seq.* It abandoned that argument at oral argument, at least as to past damages, although it continued to maintain its claim regarding future harm. Id. at 15, *et seq.*

Clause,[38] Congress is given broad authority to condition receipt of federal funds in order to further policy objectives. Supplemental Brief at 19 (citing United States v. American Library Assoc., Inc., et al., 539 U.S. 194, 203, 123 S. Ct. 2297, 156 L. Ed. 2d 221 (2003)); CSUSTL Amicus Brief at 26. They say that broad authority was clarified in United States v. Butler, 297 U.S. 1, 56 S. Ct. 312, 80 L. Ed. 497 (1936), and incident to it Congress may attach conditions on the receipt of federal funds. Supplemental Brief at 20 (citing South Dakota v. Dole, 483 U.S. 203, 206, 107 S. Ct. 2793, 97 L. Ed. 171 (1987)); CSUSTL *Amicus* Brief at 26. Accordingly, they claim, the CDSOA's support requirement meets constitutional muster.

The CDSOA proponents then argue that the support requirement has ". . . an important non-speech purpose of . . . designating a class of beneficiaries . . . affected by foreign dumping and subsidization and who actively supported the imposition of antidumping duties."[39] Supplemental Brief at 23. They argue that nothing in the CDSOA prohibits someone from indicating support on the questionnaire while advocating publicly against it.[40] Id. at 23-24

---

[38] U.S. Const. Art. I, §8, cl. 1 empowers the Congress to spend money ". . . to provide for the common Defence and general Welfare of the United States."

[39] The CSUSTL also argues, without citation to specific supporting authority, that the Government "has an interest in using funds to support fair trade to mitigate the harms of those who have reinvested despite ongoing unfair trade practices." CSUSTL Amicus Brief at 15. CSUSTL does not explain how the interest differs between harmed domestic industries which have reinvested and supported a petition, and harmed domestic industries which have reinvested and for some reason opposed or did not support a petition.

[40] The Government does concede there are limitations on Congress' discretion to impose conditions under the Spending Clause. Supplemental Brief at 24. And that two of those are "the condition must be related 'to the federal interest in particular national projects or programs,'" and "Congress may not 'induce' the recipient 'to engage in activities that would themselves be unconstitutional." Id. (citing South Dakota v. Dole at 210).

The Government argues the first condition is met because the "requirement is an efficient

Finally, says the Government, the CDSOA is not subject to strict scrutiny, Regan v. Taxation With Representation of Washington, 461 U.S. 540, 547, 103 S. Ct. 1997, 76 L. Ed. 2d 129 (1983), because it does not "burden a fundamental right." Supplemental Brief at 28. It bases that proposition on its arguments above, and those following that it is neither "viewpoint discrimination" nor an "unconstitutional condition." Id. Thus, it says, the support requirement need only be "rationally related to a legitimate government interest; a standard "easily satisfied," because it is a "reasonable and rationale[sic] way to select the members of the domestic industry most affected by foreign dumping and subsidization" Id. at 28.

**2**
**The Support Requirement Is Not Viewpoint Discrimination**

The Government argues Congress may selectively fund domestic producers affected by unfair trade and may define the program's limits. Supplemental Brief at 30 (citing Rust v. Sullivan, 500 U.S. at 194). It rests that argument on the proposition that "Congress rationally assumed that domestic producers who did not support the imposition of antidumping duties had no need to share in the total duties collected as a result of the antidumping duty order." Supplemental Brief at 31.[41]

_____

and accurate method for the ITC to identify those parties that are most affected by dumping and subsidization . . ." and the second because the support requirement "has nothing to do with the regulation of speech or any other private conduct." Id. at 25-26. "By this condition," the Government argues "Congress is simply providing an efficient and accurate avenue to assess those domestic producers most likely affected by foreign dumping and subsidization." Id. at 26.

[41] Defendant argues that "in determining whether a viewpoint-based restriction exists, the Court must consider the overall purpose of the funding program, specifically whether the Government is expending funds to promote a particular message." Supplemental Brief at 31 (citing American Library, 539 U.S. at 213 n.7). Thus, says the Government, since the CDSOA is not attempting to restrict or facilitate certain ideas in public discourse, it could not be engaged in viewpoint discrimination. Supplemental Brief at 32.

27

**3**
**The Support Requirement Does Not Burden Speech in A Public Forum**

Defendant and CSUSTL both cite <u>American Library</u>, 539 U.S. at 204, for the proposition that public forum principles are out of place here because, it says, there is no forum at issue in this case because the ITC questionnaire is exclusively a mechanism for presentation of views to the government. Supplemental Brief at 33; CSUSTL Amicus Brief at 18-19. A designated public forum, says the Government, is created only when it, by fiat, makes an affirmative choice to open up its property for use as a public forum. Supplemental Brief at 34 (citing <u>Perry Educ. Assn</u>, 460 U.S. at 46). Because questionnaire responses are afforded proprietary treatment by the ITC, says Defendant, there is simply no forum at issue. <u>Id.</u> at 35. CSUSTL, in discussing the same point, argues that "[t]he underlying purpose of the ITC's investigation is not to *facilitate* the expression of diverse views but, rather, to make a discrete inquiry based on record evidence and pursuant to statutory criteria. CSUSTL *Amicus* Brief at 19 (emphasis in original).[42]

The lack of a forum distinguishes this case from <u>Rosenberger</u>, says Defendant, because the CDSOA was not designed to facilitate any kind of speech. Supplemental Brief at 35. Since the spending here is not "aimed at the suppression of dangerous ideas," says the Government, its power to encourage actions in the public interest is far broader.[43] <u>Id.</u> at 36 (citing <u>Regan</u> 461 U.S.

---

[42] At a later point, *amicus* CSUSTL also argues that "the ITC's role, by its very nature, is to reach a determination that advances Government policy, not to debate that policy." CSUSTL Amicus Brief at 22. CSUSTL supports that proposition with no citation to anything other than a naked statutory citation.

[43] The Government here makes an argument the court finds most enlightening in its analysis:

The CDSOA is not aimed at suppression of dangerous ideas. If Congress sent questionnaires to areas damaged by floods and asked the residents to identify

at 550).

The essence, at least, of CSUSTL's *Amicus* Brief on this issue may be found in a

footnote. There, CSUSTL argues:

> . . . INA is factually incorrect in arguing that the "support" requirement
> "penalizes" CDSOA recipients by requiring them to "surrender" or relinquish"
> their constitutional rights. The CDSOA does not *require* recipients to do
> anything—it is simply a spending program wherein Congress has chosen to
> provide funds to those producers that indicate concern with perceived unfairly
> traded imports.

CSUSTL *Amicus* Brief at 23 n.65 (italicized emphasis in original, underlined emphasis added)

(internal citations omitted).

**4**
**The Support Requirement Does Not Implicate Political Speech**

The Government finds misplaced Plaintiff's and *Amici's* argument that the support

requirement extracts political speech from the domestic industry. Political speech, Defendant

says, is limited to "speech in connection with the electoral process." Supplemental Brief at 37

(citing Mills v. Alabama, 384 U.S. 214, 218-219, 86 S. Ct. 1434, 16 L. Ed. 2d 484 (1966)).

Defendant says political speech includes "discussion of candidates, structures and forms of

---

> whether they were hurt by the flooding and express support for flood relief by
> checking "yes," "no," or "take no position," no one would seriously contend that
> the Government was discriminating on the basis of viewpoint by providing relief
> only to those persons who checked "yes."

Supplemental Brief at 36.

Defendant does not indicate in its example whether the flood area residents would be
asked separate questions as to whether they were hurt, and whether they supported the concept of
flood relief. Nor does it explain how the Government would react in its hypothetical if a resident
drew an arrow to the yes box to show she was harmed but a no box as to whether she thought
flood relief was a good idea.

government, the manner in which government is operated or should be operated, and all such matters relating to political process." Id. (quoting Id). It cites no authority for the proposition that political speech does not include antidumping policy.[44]

**5**
**The Support Requirement Does Not Impose An Unconstitutional**
**Condition On Receipt of Federal Funds**

Finally, Defendant and CSUSTL argue no unconstitutional condition arises from the support requirement because "unconstitutional conditions jurisprudence is implicated only when the Government is expending funds to encourage or facilitate views from private speakers. Supplemental Brief at 38 (citing American Library, 539 U.S. at 213 n.7); CSUSTL Amicus Brief at 26 *et seq*. Defendant agrees that under the doctrine government may not deny a benefit on a basis that infringes a person's constitutionally protected speech even if he has no entitlement to the benefit. Supplemental Brief at 38 (citing Board of County Comm'rs v. Umbehr, 518 U.S. 668, 674, 116 S. Ct. 2342, 135 l. Ed. 2d 843 (1996), but argues its inapplicability based on distinguishing Speiser, 357 U.S. at 521; Perry v. Sindermann, 408 U.S. at 597; and Velazquez, 531 U.S. at 247-48.

The Government finds them inapplicable because, it says, the doctrine is not implicated where the program expends funds to encourage a diversity of views from private speakers. Supplemental Brief at 40 (citing American Library, 539 U.S. at 213, n.7).[45] And, it says, because

---

[44] Nor, indeed, does it cite authority that the CDSOA and its peculiar approach to assisting harmed industries was not in itself a result of the political process.

[45] CSUSTL rejects Giorgio's argument that the Government's lack of speech is dispositive on this issue as "simply mistaken." CSUSTL Amicus Brief at 28 (citing American Library 539 U.S. at 213 n.7).

the CDSOA is not designed to encourage such a diversity of views or advance any message. In addition, Defendant says, since unconstitutional conditions cases involve situations where imposed conditions effectively prohibit the recipient from engaging in protected conduct outside the federally funded program, the doctrine does not apply because the CDSOA does not prohibit recipients from freely rejecting in public the statement they made in the questionnaire response. Supplemental Brief at 42 (citing Rust, 500 U.S. at 197). CSUSTL makes essentially this same argument stating "[t]he CDSOA's "support" requirement merely affirms the limits of the *program's* scope by allocating funds to affected domestic producers who express a need for relief, no more and no less. CSUSTL Amicus Brief at 30 (emphasis in original).[46]

## VIII
### The Standard By Which Plaintiff's Motion for Summary Judgment Must be Judged

The Court of International Trade will grant a party summary judgment when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." USCIT R. 56(c); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In its evaluation and analysis of the motions, "[t]he Court may not resolve or try factual issues." Phone-Mate, Inc. v. United States, 12 CIT 575, 577, 690 F. Supp. 1048 (1988), *aff'd*, 867 F.2d 1404 (Fed. Cir. 1989). In order to determine whether there exists a genuine issue of material fact, the court reviews the proffered evidence "in the light most favorable to the party opposing the motion, with doubts resolved in favor of the opponent." Dow

---

[46] CSUSTL cites no specific authority for that proposition, apparently relying on its previously stated arguments. It does not point to a specific manner in which, for example, inquiring of a domestic producer if it takes no position on an investigation, reasonably informs that producer the ITC is actually interested in whether the producer believes it has been harmed.

Agro Scis. LLC v. Crompton Corp., Appeal No. 2005-1524, 2006 U.S. App. LEXIS 11320 at *10-11 (Fed. Cir. May 5, 2006) (quoting Chiuminatta Concrete Concepts v. Cardinal Indus., 145 F.3d 1303, 1307 (Fed. Cir. 1998)) (quotations omitted).  Absent a finding of any "disputes over facts that might affect the outcome of the suit under the governing law," summary judgment will be entered for the moving party.  Anderson, 477 U.S. at 248.

## IX

### Discussion

As discussed above, Chez Sidney's only remaining claim for relief must survive or fail on its argument that the CDSOA unconstitutionally violates its First Amendment rights to free speech.  The discussion which follows deals only with that issue and the standing of Plaintiff to raise it.  It is with the standing issue that the court must first begin, although it is one easily determined, given the concessions of Defendant at oral argument.

### A

### Chez Sidney Has Standing to Makes Its Claim Under the First Amendment

In its Supplemental Brief, the Government argued strenuously that Chez Sidney lacked standing to raise a First Amendment argument.  Its initial standing argument centered on the position that:

> The timing of events is the fundamental flaw with Chez Sidney's First Amendment challenge.  The alleged injury - that is, the freedom to express a position on the May 5, 1997 questionnaire - occurred more than three years prior to the enactment of the CDSOA.  Pub. L. No. 106-387 at § 1002.  Given the timing of these events, Chez Sidney cannot plausibly claim that its freedom of speech was restrained or suppressed when the source of this alleged injury was not even enacted when the expression was made. At the time it answered the questionnaire, Chez Sidney had the choice to express any position it desired,

32

without fear of Government penalty, coercion, or the denial of benefits. Thus, because no injury to the right of free speech occurred at the time the expression was made, Chez Sidney has no standing to assert a claim under the First Amendment.

Supplemental Brief at 13.

At oral argument, the Government abandoned its standing argument to the extent Chez Sidney was seeking already existent damages.[47] The Government continued to argue, however, that Plaintiff lacked standing as to claims of a "chilling effect" on First Amendment rights of expression since the CDSOA was passed after Plaintiff asserted its positions in response to the ITC questionnaires.

The Government's argument, however, may ignore the point that, under American law, after the fact punishment for the exercise of free speech is every bit as pernicious as any form of prior restraint. Sec'y of State of Md. v. Joseph H. Munson Co., Inc., 467 U.S. 947, 969, 104 S. Ct. 2839, 81 L. Ed. 2d 786 (1984). It is, in any case, apparently mooted by the 2006 repeal of the CDSOA. 109 Pub. L. No. 171, 1120 Stat. 4 (February 8, 2006). Plaintiff simply does not, in the future, need to worry about harm accruing to it from any response to an ITC questionnaire; there will be no payments given or withheld as a result of any answer it makes.

Accordingly, given the Government's concession and the discussion above, an analysis of the merits of Plaintiff's claims is required.

_____

[47] "At oral argument, we conceded that [P]laintiff has standing to assert First Amendment challenges based upon viewpoint discrimination and unconstitutional conditions. . .." Defendant's Post-Argument Submission, dated March 19, 2004, at 7 n.6.

**B**

**First Amendment Analysis**

**1**

**The General First Amendment Background To Cases Involving Statements Of Opinion**

The essence of this case is crystalized in the Government's statement that "the ITC determined that Chez Sidney did not show <u>the requisite support for the petition</u> . ..." Supplemental Brief at 10 (emphasis added). At the core of this nation's version of democracy is the ability to speak about proposed government actions on pressing public `issues without fear of government retribution and without the requirement that a particular position be supported. Quite arguably the true American Revolution began not in the 1770's, but in 1735 at the trial of John Peter Zenger, when we began to diverge[48] from the British law of seditious libel. The jury

---

[48] As the Sixth Circuit has explained the divergence:

The problem of using licensing to control distribution of printed expression by booksellers and publishers has a long history. Milton's *Areopagitica* remains the classic argument against the licensing of speech. Writing in 1644, just after the revolution, in response to a parliamentary law reestablishing the use of licensing to control books, Milton takes as his "task . . . to show that no . . . well instituted state, if they valued books at all, did ever use" "this authentic Spanish policy of licensing books." He argues instead that "the timeliest and most effectual remedy" is subsequent evaluation and seizure if necessary. Among his many arguments, Milton advances the danger to truth and beauty because they are difficult to distinguish from falsity and ugliness (however "much we thus expel of sin, so much we expel of virtue, for the matter of them both is the same") and the problem of the "quality which ought to be in every licenser" ("he who is made judge to sit upon the birth and death of books . . . had need to be a man above the common measure, both studious, learned, and judicious". Yet, "there cannot be a more tedious and unchosen journeywork . . . than to be made the perpetual reader of unchosen books and pamphlets"). Licensing speech discourages new ideas ("I found and visited the famous Galileo, grown old, a prisoner to the Inquisition, for thinking in astronomy otherwise than the Franciscan and Dominican licensers thought"); undermines expression as a value in itself ("give me the liberty to

34

summation by Andrew Hamilton still speaks to the Government's position in this case:

> [I]t is natural, it is a privilege, I will go farther, it is a right, which all free men claim, that they are entitled to complain when they are hurt. They have a right publicly to remonstrate against the abuses of power in the strongest terms, to put their neighbors upon their guard against the craft or open violence of men in authority, and to assert with courage the sense they have of the blessings of liberty, the value they put upon it, and their resolution at all hazards to preserve it as one of the greatest blessings heaven can bestow.

John Peter Zenger Trial, A Brief Narrative of the Case and Trial of John Peter Zenger, TRIAL RECORD, http://www.law.umkc.edu/faculty/projects/ftrials/zenger/zengerrecord.html (last visited on July 9, 2006).

---

know, to utter, and to argue freely according to conscience, above all liberties"); and raises the prospect of manipulation and misinformation when we "pretend to bind books to their good behavior" ("for what magistrate may not be misinformed, and much the sooner, if liberty of printing be reduced into the power of a few?").

City of Paducah v. Investment Ent't, Inc., 791 F.2d 463, 465-66 (6th Cir. 1986), cert. denied 479 U.S. 915, 107 S. Ct. 316, 93 L. Ed. 2d 290 (1986).

By the late Eighteenth Century, Milton's view against licensing had become the English common law rule against prior restraint, as reflected in Blackstone's Commentaries:

> The liberty of the press is indeed essential to the nature of a free state: but this consists in laying no previous restraints upon publications . . ..  To subject the press to the restrictive power of a licenser, as was formerly done, both before and since the revolution, is to subject all freedom of sentiment to the prejudices of one man, and make him the arbitrary and infallible judge of all controverted points of learning, religion, and government.

WILLIAM BLACKSTONE,  COMMENTARIES ON THE LAWS OF ENGLAND, BOOK THE FOURTH 151-52 (William S. Hein & Co., 1st Ed. 1992).

The British common law against licensing publishers and booksellers was part of the foundation for the First Amendment's guarantee of freedom of the press. See ZECHARIAH, CHAFEE, FREE SPEECH IN THE UNITED STATES 10-12 (Harvard Univ. Press 1942) (arguing that the Blackstonian view of freedom of the press--freedom from prior restraint--was part, but only part, of the freedom that the first amendment had come to guarantee).

This nation is committed to a robust debate on public issues. New York Times v. Sullivan, 376 U.S. 254, 270, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964). Accordingly, "the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." FCC v. League of Women Voters, 468 U.S. 364, 414, 104 S. Ct. 3106, 82 L. Ed. 2d. 278 (1984) (Stevens J. dissenting). The court must determine whether those First Amendment limitations apply when government regulates speech directed at the core of one of the most contentious issues now debated among nations, and whether the government may avoid those limits through payment to persons who express a favored viewpoint.

While New York Times v. Sullivan dealt with a libel claim by a public official, its discussion of the general freedom of expression accorded under the Constitution speaks squarely to the key issues here at stake:

> The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions. The constitutional safeguard, we have said, "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." Roth v. United States, 354 U.S. 476, 484, 77 S. Ct. 1304, 1 L. Ed. 2d 1498. "The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system." Stromberg v. California, 283 U.S. 359, 369, 51 S. Ct. 532, 75 L. Ed. 1117. "It is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions," Bridges v. California, 314 U.S. 252, 270, 62 S. Ct. 190, 197, 86 L. Ed. 192, and this opportunity is to be afforded for "vigorous advocacy" no less than "abstract discussion." N.A.A.C.P. v. Button, 371 U.S. 415, 429, 83 S. Ct. 328, 9 L. Ed. 2d 405. The First Amendment, said Judge Learned Hand, "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all." United States v. Associated Press, 52 F. Supp. 362, 372 (S.D.N.Y. 1943). Mr. Justice Brandeis, in his concurring opinion in Whitney v. California, 274 U.S. 357, 375-76, 47 S. Ct. 641, 648, 71 L. Ed. 1095, gave the principle its classic formulation:

*   *   *

> Those who won our independence believed . . . that public discussion is a political duty; and that this should be a fundamental principle of the American government. They recognized the risks to which all human institutions are subject.  But they knew that order cannot be secured merely through fear of punishment for its infraction; that it is hazardous to discourage thought, hope and imagination; that fear breeds repression; that repression breeds hate; that hate menaces stable government; that the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies; and that the fitting remedy for evil counsels is good ones.  Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law – the argument of force in its worst form.  Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed.
>
> Thus we consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open . . .

New York Times v. Sullivan, 376 U.S. at 269-71 (emphasis added).

As stated by Justice Sutherland in West Virginia State Board of Ed. v. Barnette, 319 U.S. 624, 642, 63 S. Ct. 1178, 87 L. Ed. 1628 (1943), "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."

In Hurley, 515 U.S. at 573, the Court notes that "the fundamental rule of protection under the First Amendment [is] that a speaker has the autonomy to chose the content of his own message." Id. (emphasis added).  The Court goes on to note that outside the context of commercial advertising the State "may not compel affirmance of a belief with which the speaker disagrees ... [n]or is the rule's benefit restricted to the press, being enjoyed by business corporations generally and by ordinary people engaged in unsophisticated expression as well as

by professional publishers. Its point is simply the point of all speech protection, which is to shield just those choices of content that in someone's eyes are misguided, or even hurtful. Id. (citations omitted).

*     *     *

> The very idea that a noncommercial speech restriction be used to produce thoughts and statements acceptable to some groups or, indeed, all people, grates on the First Amendment, for it amounts to nothing less than a proposal to limit speech in the service of orthodox expression. The Speech Clause has no more certain antithesis.

Id. at 579.

The Government's argument that domestic industry's First Amendment Rights are not implicated seems to be answered by the Court's statement in Pacific Gas & Elec. Co. v. Pub. Util. Comm'n. of Cal. 475 U.S. 1, 16, 106 S. Ct. 903, 89 L. Ed. 2d 1 (1986) that:

> That kind of forced response is antithetical to the free discussion that the First Amendment seeks to foster. For corporations as for individuals, the choice to speak includes within it the choice of what not to say. And we have held that speech does not lose its protection because of the corporate identity of the speaker. Were the government freely able to compel corporate speakers to propound political messages with which they disagree, this protection would be empty, for the government could require speakers to affirm in one breath that which they deny in the next.

Id. (emphasis added) (citations omitted).

Despite those strictures, however, there do exist circumstances in which governmental authorities may impose limits on the free expression of political ideas and positions. Given the articulated value of such expression to our political system, however, they are bound by stringent limitations, and in some cases, strict judicial review. In essence, if "the best test of truth is the power of the thought to get itself accepted in the competition of the market," Abrams v. United

38

States, 250 U.S. 616, 630, 40 S. Ct. 17, 63 L. Ed. 1173 (1919) (Holmes, J., dissenting), then the worst way to determine whether a petition for government action has public approval is to pay supporters of only one side. Id.

**2**

**In Some Circumstances The Government May Legitimately
Reward or Penalize Otherwise Protected Speech**

The Supreme Court has carved out a clear area in which the nature of speech is such that government may limit expression through indirect means. Government may also, in other more circumscribed ways, limit speech in a direct fashion when its interest reaches a sufficiently high plateau.

**a**

**Under The American Library Doctrine, A Government Funding Program May
Refuse To Fund Protected Activity If It Does Not Impose A Penalty On That Act**

One core of the Government's argument is that, based on American Library, under the Constitution's Spending Clause, Congress is given broad authority to condition receipt of federal funds in order to further policy objectives. Supplemental Brief at 2. The Court has provided guidance and distinguishing circumstances in which Congress may use funding programs for legitimate governmental aims from those in which it actually penalizes protected activity. See American Library, 539 U.S. at 203; see also Rumsfeld v. Forum for Academic & Institutional Rights, 126 S. Ct. 1297, 164 L. Ed. 2d 156 (2006).

In American Library, the Court held that requiring public libraries receiving federal funds to install Internet filters did not force them to violate patrons' First Amendment rights, and was a valid exercise of Congressional spending power because in a funding program intended to help

public libraries fulfill traditional roles of obtaining appropriate quality material for educational and informational purposes, Congress could insist that the public funds be spent for the purposes for which they were authorized. Id. at 204-09.  The Court noted, citing South Dakota v. Dole, 483 U.S. at 206, that "Congress has wide latitude to attach conditions to the receipt of federal assistance in order to further its policy objectives." American Library, 539 U.S. at 203.

Chief Justice Rehnquist, writing for the majority, distinguished Rosenberger v. Rector, *supra*, noting:

> In Rosenberger, we considered the "Student Activity Fund" established by the University of Virginia that subsidized all manner of student publications except those based on religion.  We held that the fund had created a limited public forum by giving public money to student groups who wished to publish and therefore could not discriminate on the basis of viewpoint.
>
> The situation here is very different.  A public library does not acquire Internet terminals in order to create a public forum for Web publishers to express themselves, any more than it collects books in order to provide a public forum for the authors of the books to speak.  It provides Internet access, not to "encourage a diversity of views from private speakers," but for the same reasons it offers other library resources: to facilitate research, learning and recreational pursuits by furnishing materials of requisite and appropriate quality.

Id. at 206. (emphasis added) (internal citations omitted).

What distinguishes American Library from Rosenberger, is what, with even more force, distinguishes the case here from American Library.  As is demonstrated below, in order to receive CDSOA funds, members of an affected domestic industry must not only publicly[49] support a particular viewpoint, they are required by law to give their honest opinion even if it

---

[49] While questionnaire response are confidential, the Government must, by law, publish a list of CDSOA distribution recipients allowing determination not only of supporters (who must be to make the list) but also a reasonable presumption of those in the domestic industry who did not support, by virtue of their absence. 19 U.S.C. § 1675c(d); 19 C.F.R. § 159.63(b).

adversely affects their ability to receive CDSOA funds.[50]  Thus, not only does the Government

have to determine, in a neutral fashion,[51] whether members of domestic industry support a

petition, it must also provide the forum in which to do so, and require participants to honestly

state their views.[52]

In Rumsfeld, the Court held that Congress could properly deny federal funding to an

institution of higher education which denied the military access for recruiting purposes. 126 S.

Ct. at 1297.  The Court noted that in American Library it held that "the government may not deny

a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech

even if he has no entitlement to that benefit," but that because Congress could directly impose

such requirements it could do so indirectly through a funding mechanism. Id. at 1307.  The Court

noted, however, that:

> The [military access] Amendment neither limits what law schools may say nor

---

[50] See discussion in Section IX(A)(3), *supra*.

[51] See discussion of requirements of SAA and 19 U.S.C. §1673a(c) at Section IX(A)(3), *infra*.

[52] Indeed, as Chief Justice Rehnquist noted in his dissent in FCC v. League of Women Voters:

> This is not to say that the Government may attach *any* condition to its largess; it is only to say that when the Government is simply exercising its power to allocate its own public funds, we need only find that the condition imposed has a rational relationship to Congress' purpose in providing the subsidy and that it is not primarily "aimed at the suppression of dangerous ideas."

468 U.S. at 407 (internal citations omitted).

Because the strictures of the CDSOA mandate a strict scrutiny test, the court need not determine here, outside of *dicta*, whether a rational relationship would be satisfied, although, as discussed below, it may well be.

requires them to say anything. Law schools remain free under the statute to express whatever views they may have on the military's congressionally mandated employment policy, all the while retaining eligibility for federal funds. As a general matter, the Solomon Amendment regulates conduct, not speech. It affects what law schools must *do*—afford equal access to military recruiters—not what they may *say*.

Rumsfeld 126 S. Ct. at 1307 (emphasis in original) (internal citations omitted).[53]

The Court's rationale in Rumsfeld is strongly distinguishable from the position of a questionnaire responding member of domestic industry. As discussed below, if they answer a questionnaire at all,[54] not only must that responder honestly state their opinion, it appears they would be subject to criminal prosecution for doing otherwise.[55]

Thus, the Spending Clause cases upon which the Government relies are inapposite to the CDSOA. Without that exception, it is to the standard by which the CDSOA's speech restriction must be judged that this analysis must now turn.

**b**

**Where A Funding Exception Is Inapplicable, Governmental Restrictions On Political Speech Are Subject To Stringent Judicial Review**

If American Library is inapplicable, the CDSOA must satisfy a very high standard of

---

[53] In support of that proposition, the Court cites the concession of the Solicitor General that law schools "could put signs on the bulletin board next to the door, they could engage in speech, they could help organize student protests." Rumsfeld 126 S. Ct. at 1307. The concession is a stark contrast from the statement at oral argument, discussed below, of counsel for the United States that members of domestic industry were required by law to state their honest opinion as to whether they supported or opposed a Petition.

[54] And the language of the questionnaire appears to make a response mandatory. See Supplemental Brief at 5 (citing Defendant's Appendix at 1); see also Plaintiff's First Amendment Brief at 3 (citing Plaintiff's Exhibit A).

[55]See Section IX(A)(3), *infra*.

review. It fails that test, and as a result its application[56] is fatal to the Government's arguments.

As Justice Scalia noted in his dissent in <u>Arkansas Writers' Project, Inc. v. Ragland</u>,

> The reason that denial of participation in a tax exemption or other subsidy scheme does not necessarily "infringe" a fundamental right is that -- unlike direct restriction or prohibition – such a denial does not, as a general rule, have any significant coercive effect. It may, of course, be manipulated so as to do so, in which case the courts will be available to provide relief. But that is not remotely the case here. It is implausible that the 4% sales tax, generally applicable to all sales in the State with the few enumerated exceptions, was meant to inhibit, or had the effect of inhibiting, this appellant's publication.
>
> Perhaps a more stringent, prophylactic rule is appropriate, and can consistently be applied, when the subsidy <u>pertains to the expression of a particular viewpoint on a matter of political concern – a tax exemption, for example, that is expressly available only to publications that take a particular point of view on a controversial issue of foreign policy</u>. Political speech has been accorded special protection elsewhere.

481 U.S. at 221 (emphasis added).

Justice Scalia has precisely described the situation which must be analyzed here . . . the need for a more stringent, prophylactic rule where a government payment rewards a particular view on a controversial issue of public policy.

"Where a government restricts the speech of a private person, the state action may be sustained only if the government can show that the regulation is a precisely drawn means of serving a compelling state interest." <u>Consol. Edison Co. v. Pub. Serv. Comm'n of New York</u>, 447 U.S. 530, 540, 100 S. Ct. 2326, 2333, 65 L. Ed. 2d 319 (1980).

It is clear from the discussion above, under <u>American Library</u> and <u>Rumsfeld</u>, that compelled speech principles apply when government offers a gratuitous benefit conditioned on

---

[56] "To survive strict scrutiny, however, a State must do more than assert a compelling state interest--it must demonstrate that its law is necessary to serve the asserted interest." <u>Burson v. Freeman</u>, 504 U.S. 191, 199, 112 S. Ct. 1846, 119 L. Ed. 2d. 5 (1992).

surrender of free speech.[57]

In <u>Perry v. Sindermann</u>, 408 U.S. 593, the Supreme Court found that the failure to renew a non-tenured professor's contract at a state university based on his public criticism of the university violated his right of free speech. The Court stated:

> For at least a quarter-century, this Court has made clear that even though a person has no "right" to a valuable governmental benefit and <u>even though the government may deny him the benefit for any number of reasons, . . . [the government] may not deny a benefit to a person on a basis that infringes his constitutionally protected interests especially, his interest in freedom of speech</u>.  For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited.  This would allow the government to "produce a result which [it] could not command directly."  Such interference with constitutional rights is impermissible.

<u>Id.</u> at 597 (internal citations omitted); <u>see</u> <u>also</u> <u>Arkansas Writers' Project</u>, 481 U.S. at 221 (sales tax exemption for certain magazines unconstitutionally conditioned tax status on content discriminating among messages); <u>Rutan</u>, 497 U.S. at 62 (conditions of public employment on political affiliations violated First Amendment); and <u>Velazquez</u>, 531 U.S. at 533 (government could not condition subsidization of legal aid attorneys on limitation of making of particular arguments).

When speech is burdened by government regulation because of its content, including by the denial of a benefit of a constitutionally protected interest that regulation is subject to strict scrutiny unless it falls within the exemptions previously discussed. <u>See</u> <u>Perry v. Sindermann</u>, 408 U.S. at 597; <u>see</u> <u>also</u> <u>Rumsfeld</u>, 126 S. Ct. at 1307.  Under the strict scrutiny standard, the

---

[57]<u>See</u> Footnote 26, *supra.*

44

government must show that the burden it imposes is "necessary to serve a compelling state interest," and that it is "narrowly drawn to achieve that end." R.A.V. v. City of St. Paul, 505 U.S. at 403 (quoting Simon & Schuster v. Members of New York State Crime Victims Bd., 502 U.S. 105, 118, 112 S. Ct. 501, 116 L. Ed. 2d 476 (1991).

> [T]he "danger of censorship" presented by a facially content-based statute, requires that that weapon be employed only where it is *"necessary* to serve the asserted [compelling] interest." The existence of adequate content-neutral alternatives thus "undercuts significantly" and defense of such a statute . . .. The dispositive question in this case therefore, is whether content discrimination is reasonably necessary to achieve St. Paul's compelling interests; it plainly is not. In fact the only interest distinctively served by the content limitation is that of displaying the city council's special hostility towards the particular biases this singled out. That is precisely what the First Amendment forbids. The politicians of St. Paul are entitled to express that hostility – but not through the means of imposing unique limitations upon speakers who (however benightedly) disagree.

Id. at 395 (internal citations omitted).

The support requirement simply cannot meet that standard. To the extent that the Government seeks, and is required to seek, accurate information about the level of support for an antidumping or subsidy petition it can, and indeed must, make the inquiry at issue. To the extent, however, that it conditions the payment of benefits to those who answer the inquiry upon the content of their opinion, it may no more do so than it may base the condition upon the color of their skin.

In the case of the CDSOA, the underlying motive articulated by Congress, assistance to members of domestic industry injured by foreign dumping and subsidies, could be achieved by a narrower inquiry; was the questionnaire respondent injured by the imports at issue? Where, as here, the respondent is required by law to provide an honest answer regarding support or non-support for the petition, and the Government is required to seek it; where the response is

burdened for opposing, or not supporting the "correct" side of a public policy question, and where a narrower and more accurate alternative exists, the strict scrutiny test is simply not met.

**3**

**Members of Domestic Industry Must, by Law, Honestly Inform the ITC
Whether They Support, Oppose, or Take No Position on an Investigation
Even If They Otherwise Believe They Have Been Harmed by Dumping**

The crux in determining this case lies in the disagreement of the parties regarding the effect of an answer to an ITC domestic industry questionnaire. As one step in determining whether domestic industry is, in fact, harmed, the Government conducts what is effectively a survey among members of the domestic industry. The Parties are at odds because the Government views the answers to that survey and not just its results, as a fact and not a statement of opinion. Plaintiff, however, argues, that the Support or Non-Support or Take No Position questions on the survey invite a statement of opinion. The problem faced by the Government is that whenever members of the public are asked for their opinion implicating issues of political, philosophical or international policy, they have a constitutional right to hold that view for a myriad of reasons, only one of which is congruent with the Government's position here. The Government and *Amici's* forceful arguments amount to a belief that economic reality indicates industry respondents will act only as rational economic beings. The Government concedes, however, that a respondent might reasonably support or oppose on other bases. That reasonable possibility is enough to render the support provision unconstitutional.

At oral argument the following colloquy occurred between the court and counsel for the United States:

The court: "So, if it doesn't support the petition, it is not, as a matter of law,

46

permitted to lie and check the box that says, "I support the petition?"

Counsel: "I would not advise anyone to do that."

The court: "Well, as a matter of law, it would be a violation of law, would it not?

Counsel: "I believe so."

TR. at 22.

The Government's questionnaire asks not for a fact but for an opinion. For the Government to say otherwise is disingenuous. It would be a fact that a number of members of a domestic industry take a particular position, and there is, indeed, a rational basis for arguing that the fact that a member of the industry supports a petition probably indicates that member perceives or itself, as having been harmed by the dumping at issue, but the one does not necessarily follow from the other, and opposition to the petition does not necessarily indicate the respondent does not perceive himself or itself as having sustained harm from foreign dumping or subsidies.

If the Government had only to demonstrate a rational basis for the support provision of the CDSOA it might be able to do so. It is not irrational to believe that there may be some correlation, indeed, quite possibly a high one, between expression of support for a dumping petition and harm to the responder. A higher level of review applies, however, to the expression of a particular point of view, because the distribution of funds is based upon the answer to what is inherently a political question.

The Statement of Administrative Action for the Uruguay Round Agreements Act makes it clear that this change is designed to implement changes required under the SAA at 807, 810-12; see also 19 U.S.C. § 3512(d).

47

Thus, the support question, in the ITC Questionnaire, is itself absolutely necessary to serve a compelling government interest as defined by the WTO Agreement. <u>Its use, however, for determining who receives distribution of government funds is not</u>. See <u>R.A.V. v. City of St. Paul</u>, 505 U.S. at 377. There are a number of other ways in which the Government might, without more effort than that which is already required, determine which members of the domestic industry claim they are harmed by foreign dumping or subsidies.[58]

Of particular note here, is the Court's discussion of the reasoning of <u>Schaumberg v. Citizens for Better Env.</u>, 444 U.S. 620, 100 S. Ct. 826, 63 L. Ed. 2d 73 (1980) in <u>Munson</u>:

> Although the Court in <u>Schaumburg</u> recognized that the Village had legitimate interests in protecting the public from fraud, crime, and undue annoyance, it rejected the limitation because it was not a precisely tailored means of accommodating those interests. The Village's asserted interests were only peripherally promoted by the limitation and could be served by measures less intrusive than a direct prohibition on solicitation.
>
> In particular, although the Village's primary interest was in preventing fraud, the Court concluded that the limitation was simply too imprecise an instrument to accomplish that purpose. The justification for the limitation was an assumption that any organization using more than 25% of its receipts on fundraising, salaries, and overhead was not charitable, but was a commercial, for-profit enterprise. Any such enterprise that represented itself as a charity thus was fraudulent.
>
> The flaw in the Village's assumption, as the Court recognized, was that there is <u>no necessary connection</u> between fraud and high solicitation and administrative costs. A number of other factors may result in high costs; the most important of these is that charities often are combining solicitation with dissemination of information, discussion, and advocacy of public issues, an activity clearly protected by the First Amendment and as to which the Village had asserted no legitimate interest in prohibiting. In light of the fact that the interest in protecting against fraud can be accommodated by measures less intrusive than a direct prohibition on solicitation, the Court concluded that the limitation was insufficiently related to the governmental interests asserted to justify its

---

[58] Not the least of which would be to simply add a question to the questionnaire inquiring whether the respondent was harmed by the dumping or subsidy at issue.

interference with protected speech.

Munson, 467 U.S. at 961-62 (emphasis added).

The same logic applies here. There is no necessary connection between support for a

petition and harm to a domestic producer.[59] Accordingly, the support requirement of the CDSOA

---

[59] Given the CDSOA's failure to meet strict scrutiny, there is no need to discuss Plaintiff's arguments regarding over and under inclusiveness of the statute. "Substantial overbreadth" is a criterion the Court has invoked to avoid striking down a statute on its face simply because of the possibility that it might be applied in an unconstitutional manner. It is appropriate in cases where, despite some possibly impermissible application, the "'remainder of the statute . . . covers a whole range of easily identifiable and constitutionally proscribable . . . conduct . . ..'" USCSC v. Letter Carriers, 413 U.S. 548, 580-581, 93 S. Ct. 2880, 37 L. Ed. 2d 796 (1973). "The short of the matter is this: In Minnesota, a candidate for judicial office may not say "I think it is constitutional for the legislature to prohibit same-sex marriages." He may say the very same thing, however, up until the very day before he declares himself a candidate, and may say it repeatedly (until litigation is pending) after he is elected. As a means of pursuing the objective of open-mindedness that respondents now articulate, the announce clause is so woefully underinclusive as to render belief in that purpose a challenge to the credulous. See City of Ladue v. Gilleo, 512 U.S. 43, 52-53, 114 S. Ct. 2038, 129 L. Ed. 2d 36 (1994) (noting that underinclusiveness "diminish[es] the credibility of the government's rationale for restricting speech"); Florida Star v. B.J. F., 491 U.S. 524, 541-542, 109 S. Ct. 2603, 105 L. Ed. 2d 443 (1989) (Scalia, J., concurring in judgment) ("[A] law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction upon truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited." (internal quotation marks and citation omitted)). See Republican Party of Minnesota v. White, 536 U.S. 765.

It is worth mentioning, however, that it seems that here, the support requirement is simultaneously over and underinclusive. According to the Government:

> The primary purpose of providing "offset distributions" to affected domestic producers is to remedy the effects of injurious dumping in the domestic market and restore conditions of free trade. See Byrd Amendment, Pub. L. No. 106-387, § 1003, 114 Stat. 1549 at 1549-72; Huaiyin Foreign Trade Corp. v. United States, 322 F.3d 1369 (Fed. Cir. 2003).

Supplemental Brief at 4.

As written, however, the support requirement does both more and less than remedy the effects of injurious dumping. Under its terms it includes as an affected domestic producer any petitioner or interested party which supports the Petition. It does not inquire whether an affected

49

must fail the strict scrutiny required by the First Amendment.

**X**

**Conclusion**

Except for its First Amendment claim, and the issues of severability and damages, upon which the court reserves decision, Plaintiff's Motions are denied and the Defendant's Motion is granted.

It is both axiomatic, and the core basis for our political system, that government derives its just powers from the consent of the governed. DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776). The validity of that consent depends, at least in part, upon its grant by the populace unforced by fear or favor. Imposition by law of a penalty for failure to support a particular governmental policy, must of necessity derogate from that consent and thus affect the very foundation of legitimacy of government. As to Plaintiff's First Amendment claim, therefore, the CDSOA's support requirement, having failed to meet strict scrutiny, is in violation of the Constitution.

---

domestic producer has, in fact, been harmed. Nor does it seek to determine whether a domestic producer which might have opposed the petition for other reasons, is nevertheless harmed by the conduct at issue. Thus, it manages to potentially both include unharmed domestic producers and exclude harmed ones.

Given the importance of the matter decided, the court has decided that there is no just reason for delay to give the parties an opportunity to present this issue to the Court of Appeals.


/s/ Evan J. Wallach, Judge
Evan J. Wallach, Judge

Date:   July 13, 2006
        New York, New York