**Slip Op. 06- 139**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS

_____
                                        :
SKF USA INC.,                           :
                                        :
         Plaintiff,                     :
                                        :
         v.                             :
                                        :
UNITED STATES OF AMERICA,               :
UNITED STATES CUSTOMS AND BORDER        :
PROTECTION, ROBERT C. BONNER            :
(COMMISSIONER, UNITED STATES CUSTOMS    :   Court No. 05-00542
AND BORDER PROTECTION), UNITED STATES   :
INTERNATIONAL TRADE COMMISSION, and     :
STEPHEN KOPLAN (CHAIRMAN, UNITED        :
STATES INTERNATIONAL TRADE COMMISSION), :
                                        :
         Defendants,                    :
                                        :
         and                            :
                                        :
TIMKEN US CORPORATION,                  :
                                        :
         Defendant-Intervenor.          :
_____:

[Held: Plaintiff's USCIT R. 56.1 Motion for Judgment Upon the Agency Record is granted in part and denied in part. Case remanded.]

        Steptoe & Johnson LLP (Herbert C. Shelley, Alice A. Kipel, Susan R. Gihring and William G. Isasi) for SKF USA Inc., Plaintiff.

        Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Jeanne E. Davidson, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (David S. Silverbrand); of counsel: Charles Steuart, United States Bureau of Customs and Border Protection, for the United States, Defendant.

        James M. Lyons, General Counsel, Neal J. Reynolds, Assistant General Counsel, Office of the General Counsel, Unites States International Trade Commission (David A.J. Goldfine) for the United States International Trade Commission and Stephen Koplan, Chairman, Defendant.

Stewart and Stewart (Terence P. Stewart, Amy S. Dwyer and J. Daniel Stirk), for Timken US Corporation, Defendant-Intervenor.

Dated : September 12, 2006

## OPINION

**TSOUCALAS, Senior Judge:** Plaintiff, SKF USA Inc. ("SKF"), moves pursuant to USCIT R. 56.1 for summary judgment on the agency record challenging Defendants, the Bureau of Customs and Border Protection's ("Customs'") and the International Trade Commission's ("ITC's") (collectively, the "Government's") determination that SKF is not an "affected domestic producer" under the Continued Dumping and Subsidy Offset Act of 2000 ("CDSOA") and thus not eligible to receive CDSOA distributions.  SKF specifically challenges the constitutionality of the CDSOA on First Amendment, Due Process and Equal Protection grounds.  The Government responds that the CDSOA is constitutional and that it correctly denied SKF "affected domestic producer" status.  Defendant-Intervenor, Timken US Corporation ("Timken") also responds that the CDSOA is constitutional and that SKF is not entitled to any relief.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(i) (2000).

**STANDARD OF REVIEW**

In matters arising under 28 U.S.C. § 1581(i), the Court will review the matter as provided in 5 U.S.C. § 706.  See 28 U.S.C. § 2640(e).  Under the Administrative Procedures Act, i.e. Title 5 of the United States Code, the Court "shall . . . interpret constitutional and statutory provisions . . .".  5 U.S.C. § 706. The Court reviews the constitutionality of a statute de novo.  See Princess Cruises, Inc. v. United States, 201 F.3d 1352, 1357 (Fed. Cir. 2000).

Under a R. 56.1 motion for judgment upon the agency record, the Court is reviewing an agency's decision based on the facts in the administrative record.  See USCIT R. 56.1.  In addition, an agency's determination must be "in accordance with law."  5 U.S.C. § 706(2)(A).  Finally, while persuasive and informative, the Court is not bound by decisions of parallel courts.  See e.g., Corus Group PLC v. Bush, 26 CIT 937, 939 n.4, 217 F. Supp. 2d 1347, 1350 n.4 (2002).

**STATUTORY BACKGROUND**

In 2000, Congress amended Title VII of the Tariff Act of 1930 by adding section 754, the CDSOA, commonly known as the Byrd Amendment.  See Pub. L. No. 106-387, § 1001 et. seq., 114 Stat. 1549A-72 to 75 (2000), codified as 19 U.S.C. § 1675c (2000).  Under

the CDSOA, Customs collects duties pursuant to antidumping duty orders and places the monies in special accounts within the United States Treasury. See 19 U.S.C. § 1675c(e). Each antidumping duty order is given its own special account. See id. Customs then disburses the money to certain "affected domestic producers" who have submitted a certification attesting that they have incurred enumerated qualifying expenditures. See 19 U.S.C. § 1675c(b) & (d). The ITC determines which entities qualify as "affected domestic producers," as defined by the CDSOA, and forwards the list of eligible entities to Customs. See 19 U.S.C. § 1675c(d). An "affected domestic producer" is defined as

> any manufacturer, producer, farmer, rancher, or worker representative . . . that -
>
> > (A) was a petitioner or interested party in support of the petition with respect to which an antidumping duty order, a finding under the Antidumping Act of 1921, or a countervailing duty order has been entered, and
> >
> > (B) remains in operation.

19 U.S.C. § 1675c(b)(1). Disbursements are made on a yearly basis and the initial disbursements were made in 2001 based on all existing antidumping duty orders at that time. See 19 U.S.C. § 1675c(d)(3); 114 Stat. 1549A-75.

In 2006, Congress repealed the CDSOA, however, the repeal is not effective until October 1, 2007. See Deficit Reduction Act of 2005, Pub. L. No. 109-171, § 7601(b), 120 Stat. 4, 154 (2006). SKF

is challenging the 2005 fiscal year CDSOA disbursements, thus, justiciable issues remain here.

## FACTUAL BACKGROUND

The facts are undisputed and briefly included here.  In 1988, Commerce initiated an antidumping investigation of antifriction bearings, other than tapered roller bearings and parts thereof, ("AFBs") from Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand and the United Kingdom.  See Br. Supp. Pl. SKF USA Inc.'s R. 56.1 Mot. J. Upon Agency R. ("SKF's Br.") at 4; Def.'s Resp. Pl.'s Mot. J. Upon Agency R. ("Customs' Resp.") at 6.  The ITC also launched material injury investigations.  See id.; Customs' Resp. at 6.  SKF was an interested party and a participant in both the original Commerce and ITC investigations and indicated that it opposed the petition in its questionnaire responses.  See id. at 5; Customs' Resp. at 6.  The ITC found material injury to the domestic industry, which SKF was a part of, by reason of imports from Japan.  See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom ("USITC Pub. No. 2185"), USITC Pub. No. 2185, Inv. Nos. 303-TA-19 & 20, 731-TA-391-399 (Final)(May

1989).[1] Commerce then determined that there were sales at less-than-fair value resulting in an antidumping duty order, which in relevant part remains in effect. See Antidumping Duty Orders for Ball Bearings, Cylindrical Roller Bearings, and Spherical Plain Bearings, and Parts Thereof From Japan, Inv. No. A-588-804, 54 Fed. Reg. 20,904 (Dep't Commerce May 15,1989). Following the enactment of the CDSOA, the ITC provided Customs with a list of entities (i.e. manufacturer, producer, farmer, rancher, or worker representative) eligible as "affected domestic producers," on which SKF was not included. See Customs' Resp. at 7.

On April 20, 2005, the ITC denied SKF's request to amend its list of eligible domestic producers to obtain CDSOA distributions with respect to duties collected pursuant to the antidumping duty order covering USITC Pub. No. 2185. See SKF's Br. at Ex. 1 & 2. The ITC stated that it denied SKF's request because SKF had opposed the petition in its questionnaire response in the original investigation. See SKF's Br. at Ex. 2. On July 13, 2005, SKF then submitted a certification to Customs requesting CDSOA disbursements in the amount of $115,033,000 for qualifying expenditures incurred. See SKF's Br. at Ex. 3. Customs denied SKF's claim on July 15, 2005, stating that SKF was not on the ITC list of affected domestic

---

[1] USITC Pub. No. 2185 is located at SKF's Br. at Ex. 5 and the ITC's final determination is published under the same name at 54 Fed. Reg. 21,488 (ITC May 18, 1989).

producers.  See SKF's Br. at Ex. 4.  This action followed.


                              **DISCUSSION**

**I.   As Applied Here, the CDSOA Violates the Equal Protection
      Clause**

      **A.   Parties' Contentions**

      SKF argues that the CDSOA is unconstitutional because it
violates the Equal Protection doctrine by discriminating between
similarly situated domestic producers.  See SKF's Br. at 12.
Specifically, SKF states that the CDSOA creates separate
classifications for domestic producers between those that expressed
support for an antidumping petition and those that did not support
or took no position.  See id. at 12-13.  Only domestic producers
that supported a petition are then eligible for CDSOA
disbursements.  See id.  SKF advances that there is no rational
basis between the classification of eligible and ineligible
domestic producers and a legitimate government objective.  See id.
at 13.  Furthermore, the separate classifications are unreasonable
and conflict with the purpose of the antidumping law.  See id. at
13-15.  In enacting the CDSOA, SKF argues that Congress amended the
antidumping law, not to alter the overall purpose of the law, but
to strengthen its remedial effect.  See Reply Br. Supp. Pl. SKF USA
Inc.'s R. 56.1 Mot. J. Upon Agency R. ("SKF's Reply") at 9.  SKF
states that the purpose of the antidumping law is to equalize trade

and prevent injury to domestic industries. See SKF's Br. at 14. The antidumping law, however, is not intended to aid any individual company. See id. Therefore, SKF reasons that because the CDSOA benefits certain individual companies and not domestic industries as a whole, it is contrary to the overall statutory purpose. See id. at 15. The CDSOA also furthers no legitimate purpose in benefitting a mere subsection of a domestic industry, when the entire domestic industry is found to be injured by the ITC. See id. SKF argues that neither the plain language of the CDSOA nor the legislative history connects "injured domestic industries" with "petition supporting domestic companies." Id. at 17. Thus, SKF concludes that the CDSOA definition for "affected domestic producer" is discriminatory with no rational basis in support. See id. at 17-19. SKF also points out that petition-supporting producers are not the only companies that are injured domestic producers and that there is no basis in differentiating between injured domestic companies as being "more deserving" or incurring more injury than another. See id. at 19. Moreover, SKF states "whether a producer believes itself to be injured by reason of imports and therefore supports a petition has nothing to do with whether the ITC actually determines injury to exist for an industry." Id. at 21. Finally, SKF also argues that the purported purpose of the CDSOA is inconsistent with the actual results of CDSOA disbursements. See SKF's Reply at 10-11. SKF also argues

that whereas Defendants contend that the CDSOA is a thorough and deliberated piece of legislation, in reality, the CDSOA was passed quickly without significant debate or committee review. See id. at 11-12. SKF reasons that such a hasty enactment hardly merits the substantial weight argued by Defendants in reviewing it. See id.

The Government responds that the classifications established in the CDSOA do not violate the Equal Protection Clause. See Customs' Resp. at 18.[2] As an economic policy decision, the Government argues that the CDSOA is rationally related to a legitimate government purpose and thus must be affirmed. See id. at 19. The Government also argues that SKF's argument that the CDSOA conflicts with the antidumping law is unsupported. See id. at 19-20. Rather, the Government asserts that the CDSOA enhances the antidumping statute's remedial nature. See id. at 20. The Government contends that the requirement in the CDSOA that a producer support an antidumping petition to then be eligible for funds is rational. See id. at 21. Since the method in the CDSOA is a "rough accommodation" for achieving the purpose of helping the domestic industry, the Government asserts it must stand. See id. at 22. The Government argues that the "affected domestic producer"

---

[2] The International Trade Commission's response brief states its "full support for the arguments made by" Customs. See Def. United States Int'l Trade Comm'n's Resp. Pl.'s Mot. J. Upon Agency R. at 1.

requirements are a "logical, objective, and efficient method for Congress to further its rational policy of strengthening remedies for unfair trade conditions by compensating those who are being most harmed by injurious dumping." Id. at 23. Moreover, the Government maintains that the CDSOA meets the overall goals of "restoring free trade and remedying the ill-affects of foreign dumping and subsidization . . .." Id. at 24. Thus, under the broad rational basis review of statutes in the areas of social and economic policy, the Government contends the CDSOA is constitutional. See id. at 24.

Timken also responds that under a rational basis review, the CDSOA does not violate the Equal Protection Clause. See Resp. Br. Timken US Corp. SKF USA's Br. Supp. Its Mot. J. Agency R. ("Timken's Resp.") at 7. Timken argues that SKF, not the Government, has the burden to illustrate that there is no rational basis for the CDSOA, which SKF failed to demonstrate. See id. at 8-9. Moreover, since the CDSOA is a statute involving economic policy scrutinized under the rational basis standard, it is reviewed with judicial restraint. See id. at 9. Thus, Timken argues that it is at least debatable "whether collected antidumping and countervailing duties ought to be distributed to some producers and not others . . .." Id. at 10. Timken states that the cases cited by SKF to support a heightened scrutiny to be applied here

are cases involving classifications based on sexual orientation, disability and legitimacy, all inapposite to matters of economic policy.  See id.  Timken further argues that the CDSOA's eligibility requirement is reasonable and rationally related to a legitimate government purpose. See id. at 13-16.  Timken advances that Congress has rationally provided for a separate definition of "affected domestic producers," which is distinct from the injured industry protected by the antidumping statute.  See id. at 15-16.  Timken reasons that Congress could rationally conclude that producers who supported a petition are affected by continued dumping in a way that other producers are not.  See id. at 16.  Thus, the classification in the CDSOA is rationally based and the statute should be affirmed.  See id.

## B.    Analysis

Congress has the authority to enact the CDSOA under the broad authority granted by either the Spending Clause or the Commerce Clause of the Constitution.  It is the constitutional limits to that authority and the scope of those limits where the CDSOA fails constitutional muster.  The Fourteenth Amendment to the Constitution of the United States provides, inter alia, that no state shall deny any person the "equal protection of the laws." CONSTITUTION Amend. XIV.  Known as the Equal Protection Clause, the Supreme Court has held that it applies to the federal government

pursuant to the Fifth Amendment's Due Process Clause.  See <u>Bolling v. Sharpe</u>, 347 U.S. 497, 499 (1954).

### 1.    Standard of Review Under the Equal Protection Clause

In the CDSOA, Congress has drawn a distinction between entities who may be "affected domestic producers" based on whether the entity supported the original antidumping petition or either did not support or took no position in the petition.  See 19 U.S.C. § 1675c(b)(1) ("a petitioner or interested party in support of the petition").  As the CDSOA is applied here, similarly situated entities, <u>i.e.</u> SKF and Timken, are treated differently and thus, do not stand equal before the law.  In areas of social and economic policy, however, a "statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld" against an Equal Protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.  See <u>FCC v. Beach Communications, Inc.</u>, 508 U.S. 307, 313 (1993) (citations omitted).  As such, the Court must review the CDSOA under this rational basis standard.  Even under a rational basis review, however, the government "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational."  <u>City of Cleburne v. Cleburne Living Ctr., Inc.</u>, 473 U.S. 432, 446 (1985).  "By requiring that the

classification bear a rational relationship to an independent and legitimate legislative end, [the court] ensure[s] that classifications are not drawn for the purpose of disadvantaging the group burdened by the law. Romer v. Evans, 517 U.S. 620, 633 (1996). "If the adverse impact on the disfavored class is an apparent aim of the legislature, its impartiality would be suspect." R.R. Ret. Bd. v. Fritz, 449 U.S. 166, 181 (1980) (Stevens, J., concurring). In addition, it is "fundamental that a section of a statute should not be read in isolation from the context of the whole [antidumping] Act." NTN Bearing Corp. of Am. v. United States, 26 CIT 53, 102-03, 186 F. Supp. 2d 1257, 1303 (2002) (citations omitted). Rather, "each part or section of a statute should be construed in connection with every other part or section so as to produce a harmonious whole . . .." Id. (citing In re Nantucket, Inc., 677 F.2d 95, 98 (C.C.P.A. 1982)).

### 2. No Rational Basis for Classification in CDSOA

The Trade Agreements Act of 1979 added the countervailing and antidumping duty provisions to the Tariff Act of 1930. See Pub. L. No. 96-39, § 101, 93 Stat. 150 (1979). In enacting the Trade Agreements Act of 1979, Congress stated that the purposes were to, inter alia, "foster the growth and maintenance of an open world trading system" and "to expand opportunities for the commerce of the United States in international trade." Pub. L. No. 96-39, § 1,

93 Stat. 146, codified as 19 U.S.C. § 2502. In 2000, Congress again amended the Tariff Act of 1930 adding the CDSOA. See Pub. L. No. 106-387, § 1003, 114 Stat. 1549A-73 (2000). In enacting the CDSOA, Congress made the following findings:

> (1) . . . injurious dumping . . . which cause[s] injury to <u>domestic industries</u> must be effectively neutralized.
>
> . . .
>
> (4) Where dumping or subsidization continues, <u>domestic producers</u> will be reluctant to reinvest or rehire . . .
>
> (5) United States trade laws should be strengthened to see that the remedial purpose of those laws is achieved.

114 Stat. 1549A-72 to 73 (emphasis added). The purpose of the antidumping law, as a whole, has always been to "equalize competitive conditions between foreign exporters and domestic <u>industries</u> affected by dumping." <u>Huaiyin Foreign Trade Corp. v. United States</u>, 322 F.3d 1369, 1379 (Fed. Cir. 2003) (emphasis added); <u>see, e.g.</u>, <u>Or. Steel Mills Inc. v. United States</u>, 862 F.2d 1541, 1545 (Fed. Cir. 1988)("the purpose of an antidumping duty order is to aid an industry, not an individual company . . .").

The Court based on the record before it, the statutory language and the legislative history, cannot find a rational basis nor is able to find any conceivable basis for the classification – distinguishing between those entities who supported a petition and those who either took no position or opposed the petition – and the purpose of the CDSOA. The antidumping statute is designed to

ensure that domestic <u>industries</u>, not any individual <u>company</u> can compete in the marketplace. <u>See</u> <u>Or. Steel Mills</u>, 862 F.2d at 1545. Congress itself has defined the term "industry" as "producers as a whole of a domestic like product . . ." in charging the ITC to determine whether a domestic industry is injured by reason of imports. 19 U.S.C. § 1677(4)(A). To make a distinction between individual producers within an industry is incongruous with the fundamental purpose of the antidumping statute, that is to remedy the injurious affects of dumping to the domestic <u>industry as a whole</u>. Furthermore, Congress stated that the CDSOA was enacted to counter the continued dumping and subsidies affecting competition in the marketplace and to further effectively neutralize the injury to the domestic industries. <u>See</u> 114 Stat. 1549A-72 to 73.

The Government and Timken argue that Congress has made a policy choice in determining that entities who supported an antidumping petition are those most harmed by injurious dumping. <u>See</u> Customs' Resp. at 23; Timken's Resp. at 15-16. The Court finds this argument unpersuasive. The plain language of the CDSOA fails to rationally indicate why entities who supported a petition are worthy of greater assistance than entities who took no position or opposed the petition when all the domestic entities are members of the injured domestic industry. Even if, however, in passing the CDSOA Congress intended to help entities that suffered more injury

than others, the Court cannot find a connection between that purpose and then to identify the gravely injured as only the ones who supported an antidumping petition. Importantly, there are three options an entity can take in an antidumping investigation: 1) support the petition, 2) oppose the petition, and 3) take no position. See PS Chez Sidney, L.L.C. v. United States, 30 CIT ___, ___, Slip Op. 06-103, *6-7 (Wallach, J. July 13, 2006). The Court cannot discern a reasonable correlation between an entity's decision to support a petition and the gravity of the entity's injury. The classification is simply too broad because there are a multitude of reasons why an entity might decide to support, oppose, or take no position in an antidumping investigation. While the Court acknowledges that an overbroad statute may survive rational basis scrutiny, the breadth cannot brush upon reasons that can conceivably infringe upon other constitutional protections, for example an expression of political belief on an antidumping petition. Cf. City of Chicago v. Morales, 527 U.S. 41, 52 (1999). Again, the focus of an antidumping investigation is whether the domestic industry, as a whole, is being injured, not just the petition supporters. See 19 U.S.C. § 1677(4)(A); Or. Steel Mills, 862 F.2d at 1545.

Furthermore, the legislative history of both the Trade Agreements Act of 1979 and the CDSOA emphasize the purpose of

remediation of injury caused by dumping and subsidies to the entire domestic industry. See e.g., H. Rep. No. 96-317 at 44 (1979) ("antidumping duties may be imposed . . . when an industry in the importing country producing a like product is materially injured"); S. Rep. No. 96-249 at 16 (1979)("ITC determines that an industry in the United States is materially injured"). Most relevantly, Congress states as part of its Congressional findings preceding the CDSOA that "injurious dumping . . . which cause[s] injury to <u>domestic industries</u> must be effectively neutralized" and that "[w]here dumping or subsidization continues, <u>domestic producers</u> will be reluctant to reinvest or rehire . . ." so therefore, the "United States trade laws should be strengthened to see that the remedial purpose of those laws is achieved." 114 Stat. 1549A-72 to 73 (emphasis added). Congress refers to the domestic industry and domestic producers in the CDSOA, as Congress has done consistently throughout the antidumping law, without preference or bias to only those entities that supported an antidumping petition. The CDSOA is an amendment to the Tariff Act of 1930 and should be read in congruity with the other provisions therein. See <u>NTN Bearing Corp.</u>, 26 CIT at 102-03, 186 F. Supp. 2d at 1303. Inclusive in the purpose of the entire antidumping statute, <u>i.e.</u> Tariff Act of 1930 with the amendments of the Trade Agreements Act of 1979 and the CDSOA, is the remedy of injury to the domestic industry. See e.g., <u>Or. Steel Mills</u>, 862 F.2d at 1545.

Here, SKF and Timken are both members of the domestic AFB industry. See USITC Pub. No. 2185 at 42. Both entities participated in the original antidumping investigation in 1988, with SKF opposing the petition and Torrington supporting it. See Corrected Admin. R. at Ex. 1 & 2. In the investigation, the ITC concluded that the entire domestic AFB industry was materially injured by reason of imports from multiple countries, including Japan. See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom, 54 Fed. Reg. at 21,488-89. Timken is classified as an "affected domestic producer" and received CDSOA disbursements only because it acquired Torrington in 2003. See SKF's Reply at 25. SKF submitted a request to the ITC to be included on the "affected domestic producer" list for the 2005 CDSOA disbursements. See SKF's Br. at Ex. 1. SKF also submitted a claim listing its qualifying expenditures for CDSOA disbursements to Customs. See SKF's Br. at Ex. 3. Both agencies denied SKF's request stating only that SKF was not an "affected domestic producer" because it did not support the original 1988 antidumping petition. See SKF's Br. at Ex. 2 & 4. As the CDSOA is applied here, SKF is not receiving Equal Protection under the laws because it is treated differently than a similarly situated party, i.e. Timken, on the sole basis of expressing opposition to an antidumping petition.

For the aforementioned reasons, such a classification is arbitrary and is not rationally connected to any legitimate objective. Therefore, the CDSOA, specifically the provision which defines "affected domestic producer," is unconstitutional as applied here. Having found that the CDSOA is unconstitutional, the Court finds it unnecessary to address SKF's other constitutional challenges and proceeds to remedies.

## II. Remedies

### A. Parties' Contentions

SKF requests that the Court issue a permanent injunction enjoining the Government from making any present or future disbursements pursuant to the CDSOA with respect to duties collected from all antidumping orders covering AFBs, or in the alternative, just ball bearings from Japan. See SKF's Br. at 40. SKF also requests that the Court order Customs to require repayment of all CDSOA funds disbursed with respect to all antidumping orders covering AFBs, or in the alternative, just ball bearings from Japan and deposited in the general treasury. See id. SKF argues that a balancing of the four factors required for a permanent injunction support its issuance. See SKF's Reply at 13. SKF asserts that it has suffered irreparable economic harm to its competitive position as a result of being denied CDSOA disbursements while its competition received the funds. See id. at 14. SKF also asserts

that the balancing of hardships weigh in its favor and that the public interest would be served by a permanent injunction. See id. at 16-18. SKF further argues that the Court has the authority to order Customs to recollect disbursed CDSOA monies under 19 C.F.R. § 159.64(b)(3). See SKF's Reply at 18. SKF points out that the Government's current position is contrary to its assurances to the Court when it argued against SKF's preliminary injunction motion. See id. at 18-19. Furthermore, inapposite to the Government's arguments, SKF argues that there is no discretionary agency action at issue here. See id. at 19. Rather, SKF is asking the Court to order Customs to seek repayment of unconstitutional disbursements. See id. Moreover, Customs' regulations indicate that it anticipates that it is required to seek repayment if an overpayment has been made as determined by court action. See id. at 20. SKF also asserts that severing the statute as suggested by Timken will not remedy SKF's injury. See id. at 21. Rather, SKF advances that its constitutional harms could be remedied if the CDSOA read so that all domestic producers were eligible for disbursements as "affected domestic producers," i.e., severing both 19 U.S.C. § 1675c(b)(1)(A) & (d)(1). See id. at 22-23. Finally, SKF argues that Timken's doctrine of laches defense is without merit and does not bar its claim. See id. at 23-25.

The Government responds that SKF has not met the burden

necessary for a permanent injunction and also inappropriately requests an order compelling agency enforcement. See Customs' Resp. at 45. Of the four factors enumerated by the Supreme Court for a permanent injunction, the Government argues that SKF has not demonstrated that it will be irreparably injured and that the public interest would be served. See id. at 45-47. The Government states that it has the authority to redistribute CDSOA funds that are found to be improperly distributed, which removes SKF's irreparable injury claim. See id. at 46. Therefore, a permanent injunction would be inappropriate. See id. at 47. The Government also argues that the Court is not empowered to order Customs to initiate collection of disbursed CDSOA monies. See id. Such an order, the Government asserts, is an intrusion upon agency discretion and an attempt by Customs to recoup CDSOA distributions "would require Customs to enforce its overpayment regulation and, thus, be an enforcement action." Id. (emphasis retained). Since the APA governs this matter, the Government states that only action legally required can be compelled of the agency. See id. at 47-48 (citing 5 U.S.C. § 706(1)). The Government states that Customs' enforcement regulation, 19 C.F.R. § 159.64(b), is a discretionary regulation. See id. at 50-52. Therefore, the Government argues that it is premature for the Court to order it to compel disgorgement because it has not yet made a decision as to whether or not to enforce 19 C.F.R. § 159.64(b), thus there is no agency

decision for judicial review.  See id.  Furthermore, the Government argues that the CDSOA does not place an affirmative obligation upon it to initiate an enforcement action, thus the Court has no basis upon which to order Customs to do so.  See id. at 52.  Finally, the Government argues that even if the Court were empowered to order Customs to take an enforcement action, there is no final agency action to enforce here.  See id. at 52-53.

Timken also responds that SKF has failed to establish that it is entitled to any relief.  See Timken's Resp. at 38.  Timken argues that SKF has failed to rebut the presumption that any unconstitutional language can be severed from the CDSOA rather than automatically invalidating the entire statute.  See id. at 39. Timken states that assuming the Court finds that the supporting the petition requirement is unconstitutional, that portion can be severed from the definition of "affected domestic producer."  See id. at 40-41.  In doing so, the Congressional intent behind the CDSOA is still preserved and the CDSOA is still operable.  See id. Timken also argues that the doctrine of laches bars SKF to any forms of equitable relief.  See id. at 42.  Timken states that SKF did not challenge the constitutionality of the CDSOA in 2001, but rather unreasonably waited until after four annual CDSOA distributions had been made before filing this action.  See id. Thus, Timken asserts that repayment of CDSOA disbursements here

would prejudice the CDSOA recipients by imposing a sizeable unexpected financial burden on those entities who reasonably relied on CDSOA disbursements.  See id. at 43.  Finally, Timken argues that SKF has not demonstrated that it is entitled to restitution or repayment, which is an equitable remedy premised in contract and inapplicable to a legislative policy choice.  See id. at 43-44.


### B.    Analysis

### 1.    The Constitutionally Offensive Language Can Be Stricken From the CDSOA

Since the definition of an "affected domestic producer" in the CDSOA is unconstitutional as applied here, the Court must determine whether the offending portions of the statute are severable or whether the entire statute is invalidated.  See Regan v. Time, Inc., 468 U.S. 641, 652 (1984)(plurality opinion)("a court should refrain from invalidating more of the statute than is necessary."); Buckley v. Valeo, 424 U.S. 1, 108 (1976).  The Supreme Court has reiterated that "whenever an act of Congress contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of this court to so declare, and to maintain the act in so far as it is valid."  El Paso & Ne. Ry. Co. v. Gutierrez,  215 U.S. 87, 96 (1909).  Also material in "evaluating severability is whether the statute will function in a manner consistent with the intent of Congress.  Alaska Airlines,

Inc. v. Brock, 480 U.S. 678, 685 (1987)(emphasis retained). "[T]he unconstitutional provision must be severed unless the statute created in its absence is legislation that Congress would not have enacted." Id.

Here, the Court finds that the offending portion of the statute is easily severable from the rest of the CDSOA and will not render the statute useless. The CDSOA defines an "affected domestic producer" as "a petitioner or interested party in support of the petition with respect to which an antidumping duty order, a finding under the Antidumping Act of 1921, or a countervailing duty order has been entered." 19 U.S.C. § 1675c(b)(1)(A) (emphasis added). The Court has found that the classifying language, i.e. "support of," creates an unconstitutional distinction among similarly situated domestic producers. Therefore, the words "support of" should be stricken from the definition of an "affected domestic producer." In doing so, the Court recommends that an acceptable definition of an "affected domestic producer" should read

> (A) was a petitioner or interested party in a petition with respect to which an antidumping duty order, a finding under the Antidumping Act of 1921, or a countervailing duty order has been entered . . .

19 U.S.C. § 1675c(b)(1)(A)(as modified). The CDSOA would then include all domestic producers as eligible entities to receive CDSOA funds so long as they participated in an antidumping

investigation resulting in an order. The CDSOA also refers to the "in support of" requirement in a separate subsection, 19 U.S.C. § 1675c(d)(1), when outlining the ITC's duties to forward the list of eligible "affected domestic producers" to Customs. See 19 U.S.C. § 1675c(d)(1). In accordance with the aforementioned permissible definition of "affected domestic producer," the words "indicate support of" should be stricken from 19 U.S.C. § 1675c(d)(1) and replaced with "participated in" so that 19 U.S.C. § 1675c(d)(1) should read:

> The Commission shall forward to the Commissioner . . . a list of petitioners and persons with respect to each order and finding and a list of persons that participated in the petition by letter or through questionnaire response. In those cases in which a determination of injury was not required or the Commission's records do not permit an identification of those who participated in a petition, the Commission shall consult with the administrating authority to determine the identity of the petitioner and those domestic parties . . ..

19 U.S.C. § 1675c(d)(1)(underlined portions indicating changes).

The constitutionally acceptable definition of "affected domestic producer" allows the CDSOA to function in a manner more consistent with Congress' intent to provide relief for the entire domestic industry, as expressed in its Congressional findings and with the intent and purpose behind the overall antidumping law. See 114 Stat. 1549A-72 to 73; Alaska Airlines, 480 U.S. at 685. Congress charges the ITC to determine in an antidumping investigation whether a domestic industry is materially injured or

threatened to be injured by reason of imports of the subject merchandise. See 19 U.S.C. § 1673. An affirmative determination by the ITC indicates that it has determined as such. See id. Under the constitutionally acceptable definition of "affected domestic producer," CDSOA disbursements are now available to the entire injured domestic industry. In doing so, the CDSOA can be administered in the same way, merely without the unconstitutional classification of eligible recipients.

2. **Customs and the ITC Are to Reexamine Their Negative Decision and Determine SKF's Eligibility for CDSOA Disbursements**

Customs and the ITC denied SKF CDSOA disbursements for the 2005 fiscal year stating that SKF was not an "affected domestic producer," as defined in the CDSOA. See SKF's Br. at Ex. 2 & 4. For the foregoing reasons, the Court finds that Customs' and the ITC's determination was made under an impermissible classification. With the petition support requirement removed from the definition of "affected domestic producer," Customs' and the ITC's reason for denying SKF CDSOA disbursement would no longer exist. SKF is an eligible entity to be included on the ITC's list of "affected domestic producers" because it participated in the relevant antidumping investigation that resulted in an affirmative determination. See USITC Pub. No. 2185. As such, SKF's request for a permanent injunction is moot. Since the ITC and Customs

denied SKF's requests solely based on the fact that SKF was not an "affected domestic producer," the Court remands this matter back to the agencies for the ITC to first determine if SKF qualifies as an eligible "affected domestic producer" for the 2005 fiscal year CDSOA disbursements in accordance with this decision. If the ITC so determines, then Customs is to determine whether SKF's claim submitted for CDSOA disbursements is sufficient and if so, to then include SKF among the 2005 CDSOA recipients to receive its pro rata share. The Court determines that because Customs has yet to determine the sufficiency of SKF's claim, the issue of whether the Court is empowered to order Customs to disgorge CDSOA monies already paid is not yet ripe for review. Based on the administrative posture of this case, the Court hesitates to preempt any agency action here. Rather if SKF qualifies, the Court entrusts Customs to determine how to ensure SKF receives its pro rata share of the 2005 CDSOA disbursements as it deems fit, understanding that Customs has regulatory authority at its disposal to redistribute the disbursed funds, such as 19 C.F.R. § 159.64(b)(3).

## CONCLUSION

The Court holds that the requirement that an entity had to "support" an antidumping petition to be included as an "affected domestic producer" as defined in the CDSOA, 19 U.S.C. §

1675c(b)(1)(A), is a violation of the Equal Protection guarantees under the Fifth Amendment to the Constitution. The classification treats similarly situated domestic producers differently and is not rationally related to a legitimate government objective. The Court further finds that the classifying language "support of" is severable from the CDSOA. Therefore, the definition of "affected domestic producer" should read as "a petitioner or interested party in a petition with respect to which an antidumping duty order, a finding under the Antidumping Act of 1921, or a countervailing duty order has been entered." The Court finds all other arguments unpersuasive. Since SKF was denied "affected domestic producer" eligibility under the unconstitutional definition, the Court remands this matter to the ITC and Customs to review their decisions denying SKF CDSOA disbursements in accordance with this opinion. An order will be entered accordingly.

                                        /s/ Nicholas Tsoucalas
                                        NICHOLAS TSOUCALAS
                                        SENIOR JUDGE

Dated:     September 12, 2006
           New York, New York